[Cite as *State v. McFeeture*, 2014-Ohio-5271.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

## JOURNAL ENTRY AND OPINION
### No. 100434

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**HOLLY McFEETURE**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CR-11-546241 and CR-12-564265

**BEFORE:** McCormack, J., Jones, P.J., and Keough, J.

**RELEASED AND JOURNALIZED:** November 26, 2014

**ATTORNEY FOR APPELLANT**

Joseph V. Pagano
P.O. Box 16869
Rocky River, OH 44116


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Alison Foy
Assistant County Prosecutor
8th Floor, Justice Center
1200 Ontario Street
Cleveland, OH   44113

TIM McCORMACK, J.:

**{¶1}** Matthew Podolak died at Parma Community General Hospital in 2006. Dr. Daniel Galita, a medical examiner in the Cuyahoga County Coroner's office performed an autopsy upon Mr. Podolak. He found Podolak to have died of chronic intoxication by ethylene glycol, a chemical found in antifreeze. Six years later, in 2012, Holly McFeeture, Podolak's live-in girlfriend at the time of his death, was indicted for his murder. The matter was tried to a jury. The state alleged that three months prior to his death, McFeeture began poisoning Podolak by putting antifreeze in his iced tea. The defense alleged Podolak committed suicide. The defense's expert testified Podolak suffered from *acute* poisoning, indicative of suicide. After a lengthy trial, the jury found McFeeture guilty of aggravated murder. Having reviewed the record and applicable law, we affirm.

**{¶2}** At trial, the state presented 15 witnesses — including Dr. Galita, several police officers who investigated this matter, and Podolak's family and friends. The defense called two — its expert witness Dr. Robert Bux, and also Dr. Galita.

### A. The State's Evidence

**{¶3}** The state's witnesses testified to the following events leading to Podolak's death in 2006.

**{¶4}** Podolak was a healthy, active, 31 year-old man. He worked at Phoenix Industrial Finishes, a company owned by his uncle. He began working there soon after graduating from high school, and worked his way up in the company. His uncle was grooming him to one day take over the business. An outdoorsman, he enjoyed boating, camping, and hunting. He also played softball and hockey in his spare time.

**{¶5}** In 2003, Podolak met McFeeture. They began dating soon after and subsequently moved in together in a Cleveland home. Friends described Podolak as being ecstatic about finding a mate to settle down with and start a family. Within a year, their first child was born, followed by a second child approximately two years later. A third child from a previous relationship of McFeeture's was also part of the family.

### 1. Friends' Testimony About the Relationship

**{¶6}** One of Podolak's close friends, Dennis Owen, was with Podolak the night he met McFeeture. According to Owen, he had "bad vibes" about the relationship and shared his apprehension with Podolak. However, Podolak continued the relationship.

**{¶7}** By 2005, the relationship turned "argumentative," "strained," and "divisive." Another close friend, Russell Hersey, testified that after the relationship turned, Podolak would spend several nights at a time at Hersey's house. Hersey advised Podolak to end the relationship. Podolak, each time however, returned to McFeeture. Hersey described Podolak's moods as varying between "very happy" and "angry upset, crying upset, sometimes fearful." Hersey testified he was aware that Podolak had become depressed during this time. However, Hersey never had any concern about Podolak being suicidal. According to Hersey, Podolak was "too happy over what life would be and he was so looking forward to raising all three children." Because of the volatile situation, however, Hersey advised Podolak that he needed to protect himself and to remove any guns from the home.

**{¶8}** Owen testified that several weeks prior to Podolak's death, Podolak brought his guns to Owen for him to keep. Owen testified that Podolak was "very confused, scared [and] * * * troubled."

{¶9}   Sharon Smith, the plant manger at Phoenix Industries, testified she urged Podolak to end his relationship with McFeeture.

{¶10} Podolak had a 401(k) plan and life insurance through his employment at Phoenix Industries.   McFeeture was the beneficiary of both. Hersey, Owen, and Michael Mulhall, another friend, all similarly advised Podolak to remove McFeeture as the beneficiary.

### 2.   Podolak's Deteriorating Health in Spring of 2006

{¶11} In the spring of 2006, Podolak's health started to deteriorate.   By Memorial Day weekend, Hersey was very concerned about Podolak's physical health.   Hersey had enlisted Podolak's help to transfer a motor from one boat to another.   Podolak, who in the past was "very strong," had gained weight, sweated profusely, complained of back pain, and said he had lost his strength.   Hersey advise Podolak to seek medical attention and recommended a physician, Dr. Thomas Mandat.   Podolak went to see Dr. Mandat on July 26, 2006.   Hersey testified that on the day Podolak went to see the doctor, Podolak called him to ask about the location of Dr. Mandat's office.   Hersey heard McFeeture in the background yelling at Podolak that he was "too stupid to know where the doctor that [he was] supposed to go see was."

{¶12} Dr. Mandat testified at trial.   Dr. Mandat reported that Podolak complained of flank pain, which was pain in the lower back.   After an examination, Dr. Mandat determined Podolak had kidney stones and prescribed medicine to help with the passing of the stones and associated pain.

### 3. The Day Before Podolak's Death

{¶13} Podolak died on July 31, 2006, a few days after he saw Dr. Mandat.   The day before he died, Podolak's father talked to Podolak over the phone in the afternoon.   Podolak had

bought his daughter a fishing rod, and wanted the three of them to go fishing together. Podolak was excited about this family outing and looking forward to it.

{¶14} That evening, Podolak was at a get-together with friends, including Hersey and Owen. Hersey testified that Podolak "appeared in grave physical condition." He had gained even more weight, was sweating profusely, and had to steady himself to even walk. Podolak also complained of extreme back pain. Hersey further testified about Podolak's declining physical condition that evening. Both Hersey and Owen again advised Podolak to remove McFeeture as the beneficiary on his 401(k) plan and life insurance policy.

{¶15} Later that evening, McFeeture called Podolak's father to tell him that something was wrong with his son and that she had called 911. Podolak's father was able to speak with his son over the phone briefly, finding him confused and distressed. Podolak was soon transported by an ambulance to the hospital.

{¶16} At the hospital, the doctors determined that Podolak's kidneys were failing. Dr. Mandat was part of the medical team that treated Podolak at the emergency room. The doctors found Podolak to exhibit metabolic acidosis, which meant that his blood was very acidic. The doctors were concerned about toxic ingestion of methanol or antifreeze. McFeeture was questioned at the hospital as to whether Podolak had ingested either antifreeze or rubbing alcohol. She stated that he had not. Podolak passed away the day after he went to the hospital.

{¶17} According to Dr. Mandat's testimony, metabolic acidosis is usually related to respiratory problems, but that was not the case here. Dr. Mandat explained that ethylene glycol can also cause metabolic acidosis.

### 4. Testimony Regarding McFeeture's Demeanor
### After Podolak's Death

{¶18} A friend of McFeeture's, Rebecca Vega, testified that she reached out to McFeeture to support her in the days following Podolak's death. She went to the funeral home with McFeeture to make arrangements. Vega found it curious that McFeeture did not show "emotions whatsoever one way or the other. Not * * * anger, not a tear."

{¶19} Several other witnesses testified to McFeeture's demeanor and behavior at Podolak's services. Podolak's father testified that at the wake, he had to ask McFeeture to come into the room where the casket was to receive visitors. She acted as if she had "no feeling in her." Hersey described McFeeture as acting like it was a "party" and like "nothing had happened."

{¶20} Two weeks after Podolak's death, Vega went to McFeeture's house. She saw what appeared to be cleaning solvents out in the open in the kitchen. Vega found it concerning, given the young age of the children in the home, and asked McFeeture about it. McFeeture responded that one of the items was antifreeze and explained Podolak used it to winterize his boat. Podolak, however, had not owned a boat since 2004.

{¶21} Michael Jakyma, a Cleveland police officer, knew McFeeture since 2002. McFeeture baby-sat his children. He would go to her house to have coffee and talk. He typically called ahead because he did not want to "interrupt another man's house." One day he called McFeeture to see if he had "caught her at a bad time." She responded that he "did not have to worry about that anymore." She said, "oh, Matt died last week," sounding very casual about it. She told him Podolak had issues with his kidneys and was in pain from playing hockey.

{¶22} A month and a half after Podolak's death, McFeeture became involved in a relationship with Charles Lipscomb, another Cleveland police officer. When they first started dating, McFeeture told Lipscomb that Podolak had passed away due to kidney failure. When the autopsy results were released in January 2007, McFeeture became "worried" and told Lipscomb that maybe Podolak had committed suicide, or an angry coworker had poisoned him, or he was exposed to something at work. McFeeture told Lipscomb that she did not even know what antifreeze was.

{¶23} McFeeture told another acquaintance, Sean Walsh, that Podolak had died from an industrial accident.

### 5. Jamison Kennedy's Involvement and His Testimony

{¶24} Jamison Kennedy met McFeeture at the bar where she bartended in late 2007. They began dating in the spring of 2008. He was a convicted felon with a lengthy criminal record. He abused alcohol and drugs. When Kennedy and McFeeture started dating, McFeeture offered no details about Podolak's death.

{¶25} According to Kennedy's testimony, one day in September 2008, he and McFeeture were drinking and McFeeture got "emotional" about Podolak. She told Kennedy she "just wanted it all to go away," she wanted to move from Cleveland, and she was sorry about what had occurred. Kennedy asked McFeeture what she was sorry for. McFeeture said that she put something in Podolak's drinks, he got sick, and died.

{¶26} Around that time, Kennedy was doing computer work for an attorney friend, Santiago Feliciano. Kennedy testified that he told Santiago what McFeeture had confessed to him. Feliciano, for his part, testified that he advised Kennedy to report the information to law enforcement if Kennedy found it to be true.

**{¶27}** Soon after McFeeture's alleged confession, her relationship with Kennedy soured. Kennedy believed she had been unfaithful to him. On November 8, 2008, he went to her home to confront her. She called the police. When the officers arrived, Kennedy assaulted the officers. He was arrested and charged for the offenses. After his arrest, he told the police about McFeeture's confession. Kennedy was subsequently convicted and sentenced to ten years in prison for assaulting the officers.

## 6. Medical Examiner Dr. Galita's Testimony

**{¶28}** Dr. Galita has been a forensic pathologist and medical examiner for over ten years. His job responsibilities are to perform autopsies and to determine the cause and manner of deaths, having performed over 3500 autopsies. He performed the autopsy of Podolak the day after he died. Six months later, in January 2007, he issued an autopsy report detailing his findings. The report was signed by him and then-County Coroner Dr. Elizabeth Balraj. The report concluded the cause of Podolak's death was chronic intoxication by ethylene glycol, but "manner undetermined." Three years later, in 2010, the autopsy report was amended. The amended report, signed by then-County Coroner Dr. Frank Miller, concluded that Podolak died as a result of "chronic intoxication by ethylene glycol, and was homicidal in nature." The amended report did not change the cause of death but changed the manner of death from "undetermined" to "homicide." Neither Dr. Balraj nor Dr. Miller testified at trial.

**{¶29}** Dr. Galita, who performed the autopsy, provided extensive testimony at trial to support the state's theory that in the spring of 2006, McFeeture began poisoning Podolak by putting antifreeze in his iced tea.

**{¶30}** According to Dr. Galita, the ethylene glycol ingested by Podolak was absorbed into his blood and then went to his liver where it was rapidly metabolized by alcohol dehydrogenase.

Alcohol dehydrogenase is an enzyme, or biological substance, that facilitates certain chemical reactions in the body. When the ethylene glycol was rapidly metabolized, it was transformed into oxylate, which combined with calcium to form calcium oxylate crystals.

{¶31} There was a massive amount of these crystals in Podolak's kidneys, blocking the proper functioning of the kidneys. Dr. Galita testified that the flank pain that Podolak experienced beginning in May 2006 was due to the crystals in his kidneys. When examining Podolak's kidneys, he found that in addition to the damage in the kidneys, there was evidence that the kidneys were attempting to heal.

{¶32} Dr. Galita also found the crystals in Podolak's heart and brain. In regard to the heart, Dr. Galita determined that Podolak had "very severe acute myocarditis in the heart." Myocarditis is acute inflammation of the heart muscle. The doctor testified that Podolak would not have developed myocarditis from a single acute case of ingestion of ethylene glycol; rather, the myocarditis needed at least three weeks to develop. Galita ruled out that Podolak had suffered a heart attack.

{¶33} Dr. Galita concluded that Podolak died as a result of chronic intoxication by ethylene glycol; that his death resulted from a sequence of acute events, acute sublethal intoxications from time to time, for a period of at least three months.

{¶34} Podolak's friends testified that Podolak's favorite beverage was raspberry iced tea and he would bring it to work either in a thermos or in its original half- or whole-gallon container. His friend Michael Mulhall testified that McFeeture would sometimes bring lunch to Podolak at work, and it would always include either a half-gallon or a whole-gallon container of iced tea.

**{¶35}** The police collected two bottles of antifreeze from the garage of McFeeture's home in August 2007, after she had moved out. The state submitted these bottles as exhibits to show that there was antifreeze in the home, even though its witness Sergeant Michael Quinn acknowledged that the particular ethylene glycol in those bottles did not match the ethylene glycol found in Podolak's body.

## B. The Defense's Theory

**{¶36}** The defense theory was that Podolak committed suicide because he had sustained losses in internet gambling, work was not going well, and he was stressed from dealing with his infant child.

**{¶37}** In support of its theory, the defense presented Dr. Robert Bux, the coroner from El Paso County, Colorado. He testified that Podolak suffered from acute poisoning, meaning that it was a one-time ingestion of ethylene glycol, which would be indicative of suicide.

**{¶38}** Dr. Bux disagreed with Dr. Galita's finding of myocarditis. Rather, Dr. Bux testified that he believed Podolak had suffered a heart attack. Moreover, Dr. Bux testified that a person can have myocarditis without ethylene glycol poisoning and that flank pain "shouldn't be" a symptom of ethylene glycol poisoning. According to Dr. Bux, there is no relation between kidney stones and ethylene glycol poisoning.

**{¶39}** Dr. Bux testified that the crystals found in Podolak's kidneys began forming in the hospital. Regarding the cumulative effect of sublethal doses of ethylene glycol, he testified that "[w]e don't know the answer. The problem is that it depends if he got enough that significantly depressed his kidneys or not." Dr. Bux, however, did not deny Dr. Galita's finding that there was evidence that Podolak's kidneys had attempted to heal.

**{¶40}** After trial, the jury found McFeeture guilty of aggravated murder and contaminating a substance for human consumption. On appeal, McFeeture raises seven assignments of error for our review. We address them in the order they are presented.

[I.] The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

[II.] Appellant's convictions are against the manifest weight of the evidence.

[III.] The admission of certain testimony and evidence at trial violated appellant's Sixth and Fourteenth Amendments rights under the United States Constitution including the right to confrontation.

[IV.] Appellant was deprived of due process and a fair trial when the state introduced irrelevant, prejudicial, other act evidence and hearsay in violation of Evid.R. 401, 402, 403, 404, 602, 801, and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

[V.] The trial court erred by denying appellant's motion for a new trial.

[VI.] The trial court erred by denying appellant's motion in limine to exclude and objections to Dr. Galita's testimony as to cause and manner of death.

[VII.] Appellant was deprived of her federal and state rights by the undue preindictment delay.

## C. Sufficiency of the Evidence

**{¶41}** In the first assignment of error, McFeeture contends there was insufficient evidence for her conviction and the trial court erred in denying her motions for acquittal.

**{¶42}** In reviewing for sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶43}** This murder case is built largely on circumstantial evidence. "Proof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value." *State v. Zadar*, 8th Dist. Cuyahoga No. 94698, 2011-Ohio-1060, ¶ 18, citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988).

**{¶44}** "Circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind." *State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37. Although it requires the drawing of inferences, circumstantial evidence and direct evidence inherently possess the same probative value. *Jenks* at paragraph one of the syllabus. The United States Supreme Court had long noted that "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence." *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960). The Ohio Supreme Court also instructed that "circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Heinish*, 50 Ohio St.3d 231, 238, 553 N.E.2d 1026 (1990).

**{¶45}** In this case, the state presented extensive testimony from Dr. Galita, which established that Podolak died of chronic intoxication of a chemical found in antifreeze. This evidence, coupled with testimony about the troubled relationship between Podolak and McFeeture and the opportunity for McFeeture to contaminate what Podolak regularly consumed, viewed in a light most favorable to the state, constituted sufficient evidence to support McFeeture's conviction.

**{¶46}** On appeal, McFeeture contends that the only shred of admissible evidence that the state offered to prove her guilt was the allegation of convicted felon Jamison Kennedy.

Kennedy testified that McFeeture confessed to him, telling him that she had put something in Podolak's drink, he got sick, and passed away. McFeeture's attack on Kennedy is an attack on his credibility. Credibility is not a consideration for us under a sufficiency of the evidence review. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79.

{¶47} Construed in favor of the state, the witnesses' testimony in this case was sufficient to support the jury's finding of guilt. The first assignment lacks merit.

## D. Manifest Weight of the Evidence

{¶48} Under her second assigned error, McFeeture contends that her conviction was against the manifest weight of the evidence.

{¶49} Unlike sufficiency of the evidence, manifest weight of the evidence raises a factual issue.

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). In a manifest-weight review, the weight to be given the evidence and the credibility of the witnesses are primarily for the jury. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. When examining witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986).

**{¶50}** The state's key witness was the medical examiner, Dr. Galita, who performed the autopsy. He testified at length about how he reached his conclusion that Podolak had been chronically poisoned over a period of three months. He explained that he found crystals in Podolak's kidneys and cardiac myocarditis. Both of these conditions can arise due to exposure to ethylene glycol. He eliminated other causes of myocarditis, such as bacteria, fungi, and viruses. Moreover, he testified that myocarditis would not have occurred from a single, acute exposure to ethylene glycol.

**{¶51}** Other witnesses' testimony corroborated Dr. Galita's determination of cause of death. Podolak's friends testified that in the spring of 2006, Podolak's health began to deteriorate. He was diagnosed with kidney stones in July 2006. His health continued to decline after that. During the period of time in question, McFeeture would sometimes bring Podolak's lunch to him at work, including half- or whole-gallon containers of sweetened iced tea. Dr. Galita opined that, antifreeze, which has a sweet taste, could be mixed undetected with sweetened iced tea.

**{¶52}** Very shortly after Podolak's death, McFeeture had antifreeze out in the open in her kitchen. She explained to a friend that Podolak used it to winterize his boat, even though other testimony showed that he had not owned a boat since 2004 or 2005.

**{¶53}** Regarding the relationship between Podolak and McFeeture, the state's witnesses testified that the relationship had turned volatile. Podolak appeared to be "fearful." One friend advised him to remove his weapons from the home — advice that Podolak heeded. Podolak was also advised to end his relationship with McFeeture and to change McFeeture as the beneficiary of his 401(k) plan and life insurance policy. One such advisement was made the day before his death. The witnesses' testimony also showed McFeeture's lack of interest and

emotion after Podolak died. Not only did Podolak's family and friends notice it, McFeeture's own friend, Vega, also noticed and eventually cut ties with McFeeture because she was fearful for herself and family.

{¶54} All of this evidence was circumstantial. Circumstantial evidence, however, carries the same weight as direct evidence. Although there are obvious differences between direct and circumstantial evidence, the differences are irrelevant to the probative value of the evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001).

{¶55} The defense's theory was that Podolak committed suicide. Its expert testified that Podolak died of acute poisoning, consistent with suicide. The state, however, presented testimony showing that, although Podolak suffered from some depression, he was committed to being a father to his children. He had been making future plans for and with them, as late as the day before he died. There was also testimony showing he sought medical treatment for both his mental and physical ailments. More importantly, the medical examiner, Dr. Galita, testified that Podolak died of *chronic* intoxication over a three-month period of a chemical found in antifreeze. He testified that Podolak's death was inconsistent with suicide.

{¶56} Next, we turn to the credibility of Kennedy. Through direct and cross-examination, the jury was very much aware of Kennedy's credibility issues. He was a repeat convicted felon, abused alcohol and drugs, and only told law enforcement about McFeeture's confession after he was arrested. Notwithstanding Kennedy's credibility issues, the transcript reflects Sergeant Michael Quinn's testimony that at the time Kennedy told law enforcement about McFeeture's confession, it was not publicly known (in media coverage) that Podolak had died as a result of ethylene glycol poisoning. In other words, the record does not

support McFeeture's claim that Kennedy merely reported what he had heard elsewhere, either to gain leniency in his criminal case or to exact revenge on McFeeture.

{¶57} Our review of the evidence does not show the jury, in resolving conflicts in the evidence, clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The weight of the evidence, albeit largely circumstantial, supports the conviction. The second assignment of error is overruled.

## E. Right to Confrontation

{¶58} Under the third assigned error, McFeeture claims her right to confrontation was violated at trial.

{¶59} The Sixth Amendment's Confrontation Clause provides, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *."

{¶60} McFeeture claims her right to confront the witnesses was violated by (1) Dr. Miller's not testifying about the 2010 amendment of manner of death, (2) Dr. Galita's testifying about the toxicology reports, and (3) Detective Bobby Moore not testifying about his investigation of the case. We address these issues in turn.

## 1. Dr. Galita's Testimony About the Autopsy Report

{¶61} The state's key witness in this case was the medical examiner who performed the autopsy, Dr. Galita. McFeeture claims her right to confront the witness was violated because Dr. Miller, the county coroner in 2010 who amended the *manner* of death as homicide, did not testify.

## a. Plain Error Review

**{¶62}** McFeeture did not object at the trial level to Dr. Galita's testimony based on the Confrontation Cause. First, we note that, before trial, she filed a motion in limine to prohibit Dr. Galita from testifying. However, it was on the ground that established medical science could not support the conclusion that Podolak had been poisoned over time by ethylene glycol. McFeeture's motion did not challenge the state's plan to have Dr. Galita testify about the autopsy report, original and amended, in lieu of Dr. Miller, or in addition to Dr. Miller. In fact, in the motion the defense requested that the trial court exclude the testimony of *any* representative of the Cuyahoga County Coroner's Office.

**{¶63}** Second, we note that although the defense did raise an objection at trial to Dr. Galita's testimony regarding both the cause and manner of death, the objection, however, was based on the reasoning the defense provided in its motion in limine, not based on the Confrontation Clause. The first time an objection to Dr. Galita's testimony was lodged based on her Sixth Amendment right is on appeal.

**{¶64}** The Ohio Supreme Court has long recognized, in both civil and criminal cases, that "failure to timely advise a trial court of possible error, by objection or otherwise, results in a waiver of the issue for purposes of appeal." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1997). However, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court[.]" *Id.*, quoting Crim.R. 52(B). Further, even if the defendant satisfies this burden, the appellate court has discretion to disregard the error and should correct it "only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

**{¶65}** With this standard of review in mind, we now turn to McFeeture's claim that Dr. Galita's testimony regarding the *manner* of death in the amended 2010 autopsy report violated her Sixth Amendment confrontation right.

**{¶66}** In reviewing McFeeture's claim, we are guided by recent precedents from the United States Supreme Court and the Supreme Court of Ohio touching upon autopsy reports and testimony regarding an autopsy report.

### b. Recent Confrontation Clause Case Law in the Context of Autopsy Report

**{¶67}** In *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court interpreted the Confrontation Clause to mean that an admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause, if the statement is "testimonial," unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness.

**{¶68}** *Crawford*, however, does not involve an autopsy report. Neither did the court define the word "testimonial." In *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, the Supreme Court of Ohio applied *Crawford* in the context of an autopsy report. In *Craig*, a county medical examiner who did *not* perform the autopsy testified about the autopsy even though it was someone else — the county coroner at the time of murder but who had since retired — who performed the autopsy. The appellant claimed his Sixth Amendment right to confront witnesses was violated because the medical examiner who testified lacked firsthand knowledge of the autopsy and there was no showing the coroner who performed the autopsy was not available.

**{¶69}** The Supreme Court of Ohio held that an autopsy report completed by a nontestifying medical examiner was admissible as a nontestimonial business record under Evid.R. 803(6). The court held that there was no Sixth Amendment violation in admitting the autopsy report because *Crawford* had indicated that "business records are, 'by their nature,' not testimonial" and were therefore admissible. *Id.* at ¶ 81, quoting *Crawford* at 56. The Supreme Court of Ohio emphasized that "[a]n autopsy report, prepared by a medical examiner and documenting objective findings, is the 'quintessential business record.'" *Id.* at ¶ 82, quoting *Rollins v. State*, 161 Md. App. 34, 81, 866 A.2d 926 (2005).

**{¶70}** After *Craig*, the United States Supreme Court decided several cases on similar issues. It held that a forensic report made at police request showing a seized substance was cocaine was testimonial and analysts who had performed laboratory tests were required to testify. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). The court also held that blood-alcohol analysis reports were testimonial and a surrogate witness was not a proper substitute for the analyst who had conducted the test. *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011). In *Williams v. Illinois*, 567 U.S. ___, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), the plurality opinion applied a "primary purpose test" and held that expert testimony from a forensic specialist was non-testimonial, and did not violate the Confrontation Clause, because the report was not prepared for the primary purpose of accusing a targeted individual. *Id.* at 2242.

**{¶71}** In light of these recent United Supreme Court precedents, the Supreme Court of Ohio revisited the issue in *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930. In *Maxwell*, the medical examiner who performed the autopsy had became a medical examiner in another state and, as in *Craig*, the state called a medical expert who did *not* conduct

the autopsy to testify about the autopsy report. Appellant objected to the testimony. He argued he was entitled to confront and cross-examine the medical examiner who actually performed the victim's autopsy and wrote the report. The Supreme Court of Ohio, yet again, found no violation of the Confrontation Clause.

{¶72} The court noted that the majority of jurisdictions that had examined this issue concluded that a medical examiner who did not perform the autopsy may testify as to his or her own expert opinions and conclusions regarding the autopsy and the victim's death, citing *Commonwealth v. Avila*, 454 Mass. 744, 762, 912 N.E.2d 1014 (2009) ("the expert witness's testimony must be confined to his or her own opinions and, as to these, the expert is available for cross-examination"), *Commonwealth v. Phim*, 462 Mass. 470, 479, 969 N.E.2d 663 (2012) (a medical examiner who did not perform the autopsy may not testify on direct examination as to facts and conclusions stated in an autopsy report without personal knowledge or having independently reached the same conclusion), and *State v. Joseph*, 230 Ariz. 296, 298, 283 P.3d 27 (2012) (as long as the substitute expert reaches his or her own conclusions, the Confrontation Clause is satisfied).

{¶73} Applying the same principle, the Supreme Court of Ohio held in *Maxwell* that there was no Confrontation Clause violation. The court reasoned that the testifying medical examiner "reached his own independent judgment on the cause and manner of [the victim's] death based upon his analysis of the evidence in the autopsy report, which itself was admitted. His conclusions were the same as those in the report." *Id.* at ¶ 53.

## c. Dr. Galita's Testimony about the Autopsy Report in the Instant Case

**{¶74}** This case does not implicate the Confrontation Clause in the way the foregoing cases did. Here, the testifying medical examiner Dr. Galita *was* the one who performed the autopsy. Under the foregoing precedents, he would be permitted to testify about the autopsy report, both the 2007 original and 2010 amended report.

**{¶75}** Regarding the 2007 autopsy report, prepared by Dr. Galita and signed by both him and Elizabeth K. Balraj, then-county coroner, there is no doubt it was a business record pursuant to *Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, and *Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930. Dr. Galita's extensive testimony regarding the autopsy he performed and his finding that the cause of death was chronic intoxication by ethylene glycol did not present a *Crawford* problem.

**{¶76}** Indeed, on appeal, McFeeture does not challenge, on Sixth Amendment grounds, the 2007 autopsy report or Dr. Galita's testimony about the cause of death being chronic intoxication by ethylene glycol. She only claims the testimony provided by Dr. Galita regarding the amendment of the autopsy report — from undetermined manner of death to homicide — was a violation of her right to confrontation. She argues that Dr. Miller, the county coroner who amended the manner of death as homicide, should have been subject to cross-examination. Our careful review of the record indicates this claim lacks merit.

**{¶77}** At the hearing on the aforementioned motion in limine, Dr. Galita testified that in 2006, based on his finding of cause of death to be chronic intoxication by ethylene glycol, he ruled out Podolak's death as a suicide or a natural death, but determined that the coroner's office needed more time to investigate and obtain more information as to "exactly how this intoxication took place." (Tr. 33-34.) As a result, the coroner's office decided to rule the manner of death as

"undetermined" at the time.  It felt further investigation about the circumstances surrounding Podolak's death was necessary before it could rule the manner of death as homicide.  (Tr. 81-82.)  Dr. Galita also explained at the hearing that Dr. Miller was the one who amended the manner of death as homicide, because Miller was the county coroner at the time, and only a coroner could write the manner of death. (Tr. 81.)

{¶78} At trial, Dr. Galita provided substantial testimony regarding the cause of Podolak's death being chronic intoxication by ethylene glycol.  He was then  asked about the *manner* of death.  The transcript reflects the following testimony:

> Q. Did you have an opinion as to the manner of death at the time of your autopsy?
>
> A. The manner of death —
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Overruled.
>
> Ongoing objection noted for the record based upon the sidebar conference earlier.
>
> Proceed.
>
> A. The initial manner of death was undetermined.
>
> Q. As a, at that time, Cuyahoga County Coroner's office forensic pathologist, do you have a duty regarding determining the cause and manner of death?
>
> A. That's correct, yes.
>
> Q. What are the possibilities in terms of the manner of one's death?
>
> A. The possibilities are homicide, suicide, accident, or undetermined.
>
> Q. What do you mean by undetermined?

A. Undetermined, that we don't know exactly how the cause of death came about.

Q. What would accidental manner of death mean?

A. Accidental manner of death means that the person that dies from an event which is beyond his control but not from another human being or individual.

Q. Okay. If ethylene glycol accidentally fell into someone's cup and that person drank ethylene glycol day after day or over a period of three months, and that person was unaware that ethylene glycol was accidentally ingested —

A. Yes.

Q. — would that be an accidental manner of death?

A. Yes. It's extremely rare, I'd think —

Q. Contaminated water supply or something like that?

A. Contaminated water supply, yes.

Q. If someone wanted to commit suicide and took small amounts of ethylene glycol and ingested it a little bit at a time over a period of days, weeks, months, would that be a manner of suicide?

A. No. Because if somebody wants to commit suicide, he drinks a lethal amount of that poison.

Q. A lethal amount —

A. Being at least 120 milliliters.

Q. And are there cases of people committing suicide by taking lethal [sic] amounts of ethylene glycol?

A. No, it's not possible.

Q. Are there cases of people taking lethal amounts of ethylene glycol?

A. Yes.

Q. So 4 ounces?

A.     At least 4 ounces.

Q.     So if someone took 6 ounces of ethylene glycol and ingested it, it would be over the lethal limit?

A.     Yes, and he will die.

Q.     That will be a suicide in that case?

A.     Yes.

Q.     Then if someone were to put small amounts of ethylene glycol below the lethal level, sublethal, in someone's cup over a period of time, that would be a homicide manner of death?

A.     Yes.

Q.     So at the time of your autopsy it was undetermined because you had more than one possibility?

A.     That's correct. *We didn't have enough information to rule it as a homicide at that time*.

Q.     Information that you had included some records from Parma Medical Hospital?

A.     Records for Parma Medical Hospital, homicide investigation, and other pieces of information from different other sources.

Q.     Did there come a time when additional information was presented to the Cuyahoga County coroner's office?

A.     Yes.

Q.     And at that time, at the time of the autopsy, the Cuyahoga County coroner was Dr. Elizabeth Balraj?

A.     That's correct.

Q.     The subsequent coroner was Dr. Frank Miller?

A.     That's correct.

Q.   Did there come a time information was presented to Dr. Frank Miller?

A.   Yes.

Q.   What would the relationship be between Dr. Frank Miller and yourself at the Cuyahoga County Coroner's office?

A.   The relationship is that the coroner is the person who rules the manner of death.

Q.   Did you have an opportunity to sign the autopsy protocol in this case?

A.   Yes, I did.

Q.   It's your signature on State's Exhibit Number 1?

A.   Yes.

Q.   Is there another signature there as well?

A.   Yes, Dr. Miller's signature.

Q.   Did Dr. Balraj sign your original autopsy?

A.   That's correct.

Q.   Did there come a time when the manner of death was changed in this case —

A.   Yes.

Q.   — or amended?

A.   It was changed in 2010.

Q.   On whose authority was that manner of death changed?

A.   Dr. Miller's authority.

Q.   *Did the Cuyahoga County Coroner's office receive additional information between the time of your autopsy in 2006 and Dr. Miller's decision in 2010?*

A.      *Yes.*

Q.      Does the Cuyahoga County Coroner's office have contact with the decedent's family?

A.      Yes.

Q.      What services does the Cuyahoga County Coroner's office provide?

A.      We received information and we talked to different family members. We received letters from family members, from friends, from coworkers of Matthew Podolak, *and immediately after we signed the manner of death as undetermined we started the homicide investigation. I requested immediately a homicide investigation. And the homicide investigation brought us the two bottles of antifreeze found in the garage and also provided us valuable information from different other persons, which were interviewed in relation with this case.*

Q.      Were additional individuals interviewed in connection with this case?

A.      That's correct.

(Tr. 561-566.)

**{¶79}** As the foregoing testimony reflects, Dr. Galita testified that he, as a medical examiner, had a duty to determine both the cause and manner of death. He explained the coroner's office did not have enough information in 2007 to rule the death as homicide, and therefore the manner of death was initially ruled "undetermined." Subsequently, however, there was additional information presented to the coroner's office, which allowed Dr. Miller, the county coroner in 2010, to rule the manner of death as homicide upon his authority as the coroner.

**{¶80}** Regarding the additional information received by the coroner's office between the time of autopsy and the time the death was ruled homicide in 2010, Dr. Galita testified that after

the January 2007 initial report was issued, he immediately requested a homicide investigation and his office started the   investigation.   The investigation revealed two bottles of antifreeze found in McFeeture's garage.   His office also received information from Podolak's family members, friends, and coworkers, and additional individuals were interviewed.   Dr. Galita also testified he knew the investigation work of Detective Bobby Moore and Sergeant Michael Quinn in this case.

**{¶81}** When asked why the manner of death was eventually ruled as homicide instead of suicide, Dr. Galita explained it was because Podolak had multiple, overlapping episodes of acute intoxication over a period of three months.   (Tr. 640-641.)

**{¶82}** Thus, Dr. Galita's testimony shows he was intimately involved in the determination of both the cause and manner in the victim's death from the beginning, and his office's investigation eventually led to the manner of death being ruled as homicide.

**{¶83}** Whether we consider the homicide ruling in the amended 2010 report as testimonial or nontestimonial, Dr. Galita was more than a "substitute" medical examiner and his testimony was not "surrogate" testimony.   He *was* the medical examiner who performed the autopsy.   He prepared the autopsy report detailing his findings and concluded the death was caused by chronic intoxication of ethylene glycol.   He immediately requested the homicide investigation.   He was personally familiar with the homicide investigation throughout the six years that it took for the coroner's office, which saw a change in the County Coroner, to rule the death as homicide.

**{¶84}** "Confrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well." *Melendez-Diaz,* 557 U.S. at 319, 129 S.Ct. 2527, 174 L.Ed.2d 314. Therefore, McFeeture should be able to confront and cross-examine *Dr. Galita* regarding the

cause and manner of death in both the original and amended autopsy report. And, she did just that. The transcript shows the defense ably confronted and thoroughly cross-examined Dr. Galita regarding both the cause of death and the eventual ruling of the death as homicide. Pursuant to the precedents from the United States Supreme Court and the Supreme Court of Ohio, we perceive no violation of the Confrontation Clause in this case. The trial court did not commit error, plain or otherwise, to permit Dr. Galita's testimony about the amended manner of death.

{¶85} Even if we were to find an error in allowing Dr. Galita to testify about the ultimate ruling of homicide in the amended autopsy report, we do not find the error to have created a manifest miscarriage of justice. The state presented compelling testimony from Dr. Galita who found the victim to have died of *chronic* intoxication of ethylene glycol, and as Dr. Galita explained, the chronic nature of the intoxication ruled out suicide as the manner of death. McFeeture fails to demonstrate that the purported error in allowing Dr. Galita to testify about the homicide manner of death created a manifest miscarriage of justice.

## 2. Toxicology Reports

{¶86} McFeeture contends that her right to confrontation was also violated because Dr. Galita, rather than the toxicologist who prepared the toxicology reports, testified as to their results. We disagree.

{¶87} The toxicology reports were completed by the coroner's office as part of the autopsy protocol. The reports were done in the routine business of the coroner's office. They were clearly not testimonial, and fell under the business records exception to the hearsay rule. As such, McFeeture's contention that the toxicologist who prepared the reports was required to testify is without merit.

### 3. Police Testimony

**{¶88}** Also under the third assignment of error, McFeeture complains that her right to confrontation was violated because the state did not call the original lead detective in the case to testify.

**{¶89}** The record reflects the original lead detective, Detective Moore, had retired before the trial and the state called instead Sergeant Quinn, who had involvement in the case during Detective Moore's investigation and became more actively involved in the case after the autopsy report was amended in 2010.

**{¶90}** A careful review of Sergeant Quinn's testimony reveals that he did not testify as to any hearsay from Detective Moore. Rather, Sergeant Quinn testified as to *his own* involvement and investigation of the case. In regard to Detective Moore, Sergeant Quinn simply testified that the detective had previously been assigned to the case. Because no testimonial statement from Detective Moore was ever introduced at trial, it was not necessary for him to be available for cross-examination.

### 4. Ineffective Assistance of Trial Counsel

**{¶91}** Under the third assignment of error, McFeeture also contends that her trial counsel was ineffective for not objecting to the testimony she now contends violated her Sixth Amendment right. In order to reverse a conviction based on ineffective assistance of counsel, a defendant first "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

at 694.   In light of the foregoing analysis, we find the ineffective assistance of counsel claim to lack merit.

{¶92} The third assignment of error is overruled.

### F. Admission of Evidence

{¶93} Under her fourth assignment of error, McFeeture contends that the trial court improperly admitted evidence that was irrelevant, prejudicial, other acts evidence, or hearsay. She challenges the following testimony.

{¶94} Podolak's father described Podolak and McFeeture's relationship as strained. Podolak's friend Russell Hersey told Podolak it was not good for him to live at the home and told him to remove his shotgun from the house.   Another friend, Dennis Owen, told Podolak it would not be good to be involved with McFeeture. Podolak's colleague Sharon Smith, advised Podolak to leave McFeeture.   On several occasions, Podolak was on the phone at work with McFeeture and he was arguing, upset, and yelling.   The two's interactions were described as "fiery" by a witness.   Podolak brought his guns to Dennis Owen's house a couple weeks before he died.   McFeeture was aloof at the funeral, "carefree, superior, nothing bothered her." McFeeture's interactions with men at the funeral were "very flirtatious.   Everything belonging to Podolak been taken out of the house.   McFeeture cut up Podolak's clothes to make a quilt so his father and brother did not have any clothes to remember him by.   She began dating within a month and a half after Podolak's death.

{¶95} McFeeture contends the sole purpose of all of this testimony was to portray her as a bad character and, as such, it was irrelevant to the issue at trial — whether Podolak died of homicide, suicide, or an accident.   She argues even if the evidence was relevant, it was highly prejudicial, in violation of Evid.R. 403.

**{¶96}** The admission or exclusion of evidence rests in the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). Also, much of the challenged evidence was not objected to and therefore must be reviewed for plain error. Under either an abuse-of-discretion or plain-error review, McFeeture's claim lacks merit.

**{¶97}** Much of the testimony that McFeeture complains of relates to testimony about her demeanor and behavior following Podolak's death. The Ohio Supreme Court addressed this kind of testimony in *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565. In *Diar*, the court considered testimony in a capital murder case about the defendant-mother's behavior after her four-year-old son's death in a house fire. The court found that the testimony satisfied the requirements for lay opinion testimony under Evid.R. 701, and was therefore properly admitted. The defendant's "lack of grief and exuberant behavior on the day of [the victim's] funeral were relevant in proving motive under Evid.R. 404(B). *See State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 125 (absence of grief after being notified of wife's death admissible against defendant as lay opinion)." *Diar* at ¶ 86.

**{¶98}** Furthermore, testimony portraying McFeeture in an unfavorable light was admissible to prove motive under Evid.R. 404(B). As to testimony regarding the relationship between her and the deceased, it provided a context for the alleged crime and made her actions more understandable to the jury, and permissible under Evid.R. 404(B) as well. *Diar* at ¶ 72, citing *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 76.

**{¶99}** The fourth assignment of error is overruled.

### G. Motion for a New Trial: Materiality of Withheld Information

**{¶100}** In her fifth assignment of error, McFeeture contends that the trial court erred by denying her motion for a new trial. The motion was based on the defense learning, after the

instant trial in August 2013, that Jamison Kennedy had been an informant in a murder case prosecuted by the Cuyahoga County Prosecutor's Office that went to trial nine months earlier, in October 2012. She argues the state's failure to disclose same denied the defense impeachment material against Kennedy, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and therefore she was entitled to a new trial.

{¶101} Pursuant to *Brady*, the prosecutor is required to disclose exculpatory and impeachment evidence that is material to guilt. *Brady* at 87. Evidence favorable to the defendant is deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Bagley* at 669; *see also State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988), paragraph five of the syllabus. The Supreme Court of Ohio cautioned that in order to find the undisclosed evidence material, the omission must "'reflect our overriding concern in the justice of the finding of guilty,'" which means "'the omission must be evaluated in the context of the entire record,'" and, if "'there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.'" *State v. Jackson,* 57 Ohio St.3d 29, 34, 565 N.E.2d 549 (1991), quoting *United States v. Agurs,* 427 U.S. 97, 112-113, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

{¶102} In addition, it is the defendant's burden to prove a *Brady* violation and denial of due process. *Jackson* at 33.

{¶103} McFeeture contends that Kennedy's testimony was the "centerpiece" of the state's case. According to her, there was no other evidence of a crime or anything linking her to

Podolak's death. She argues, therefore, the withheld information regarding Kennedy was material within the meaning of *Brady*. Evaluating the undisclosed information in the context of the entire record, as we are required to, we reject this contention.

{¶104} Kennedy's testimony that McFeeture had confessed to him was certainly an important part of the state's case, but we cannot agree that it was the "centerpiece" of the state's case, especially in light of the credibility concerns that came with his testimony. A fair evaluation of the evidence in this case shows the key witness in this case was medical examiner Dr. Galita: he performed the autopsy and provided extensive testimony regarding his findings showing Podolak died of *chronic* intoxication of a chemical found in antifreeze, which ruled out suicide.

{¶105} The undisclosed information that Kennedy was an informant in another case was no doubt significant. It might have been utilized as impeachment evidence. To enhance fairness, it should have been provided to the defense. However, a review of the transcript shows that Kennedy's credibility was very aggressively attacked by the defense at trial. As such, the undisclosed evidence would only furnish an additional basis to challenge his credibility, and therefore, it would be considered cumulative, not material. *See Robinson v. Mills*, 592 F.3d 730, 736 (6th Cir. 2010) (where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by other evidence, the undisclosed evidence may be cumulative, not material).

{¶106} Accordingly, we conclude the undisclosed information is not so material for *Brady* purposes as to give rise to a reasonable probability that the outcome of the jury trial would

have been different if the information had been disclosed to the defense prior to trial. The fifth assignment of error is without merit.

## H. Motion in Limine: Dr. Galita's Testimony

{¶107} For her sixth assigned error, McFeeture contends that the trial court erred in denying her motion in limine that sought to prohibit Dr. Galita's expert testimony.

{¶108} Evid.R. 702 governs expert witness testimony and provides as follows:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

> (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

> (2) The design of the procedure, test, or experiment reliably implements the theory;

> (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶109} The trial court properly allowed Dr. Galita, who performed the autopsy of Podolak, to testify as an expert as to his findings. The Ohio Supreme Court has held that the "coroner is a medical expert rendering an expert opinion on a medical question." *Vargo v.*

*Travelers Ins. Co.*, 34 Ohio St.3d 27, 30, 516 N.E.2d 226 (1987), citing *State v. Cousin*, 5 Ohio App.3d 32, 449 N.E.2d 32, 37 (3d Dist.1982).[1]

{¶110} At the hearing on McFeeture's motion in limine, Dr. Galita testified that he had performed approximately 3,500 autopsies. Further, Dr. Galita testified that even though chronic poisoning by ethylene glycol is not widely reported in the medical literature, it is well established that chemical myocarditis takes several weeks to develop following a non-lethal ingestion of ethylene glycol. Dr. Galita further testified that his findings were subjected to peer review within the coroner's office.

{¶111} The defense and Dr. Bux disagreed with Dr. Galita's findings. That does not mean that he was not qualified as an expert. On this record, we find that Dr. Galita met the requirements to provide expert testimony, and the trial court properly denied McFeeture's motion in limine to exclude his testimony.

{¶112} Within this assignment of error, McFeeture also contends, citing R.C. 313.19, that the coroner did not utilize the proper mechanism for changing the manner of death. Specifically, McFeeture contends that a hearing should have been held in the common pleas court prior to the change. McFeeture misreads the statute.

---

[1]"Under R.C. 313.02, certain professional training and qualification as a physician are the basic qualifications for the office. The coroner is charged with autopsies and making certain medical findings. Bodies are buried or cremated ultimately and examination immediately by a qualified expert is quite essential to make determination of the causes of death while the evidence is available. But this pertains to the medical or physiological cause of death and it is reasonably clear why this determination could be given a presumption of validity. This constitutes a medical opinion on a medical question. The evidence necessary to the determination is only available during a relatively short period, and the matter is peculiarly within the special area of expertise of the coroner." *Cousin* at 34.

**{¶113}** R.C. 313.19 provides as follows:

The cause of death and the manner and mode in which the death occurred, as delivered by the coroner and incorporated in the coroner's verdict and in the death certificate filed with the division of vital statistics, shall be the legally accepted manner and mode in which such death occurred, and the legally accepted cause of death, *unless the court of common pleas* of the county in which the death occurred, after a hearing, *directs the coroner to change his decision* as to such cause and manner and mode of death.

(Emphasis added.)

**{¶114}** Thus, under R.C. 313.19, a hearing is required if the *court* directs the coroner to change his report. R.C. 313.19 contemplates situations like the one presented in *Perez v. Cleveland, Cty. Coroner*, 78 Ohio St.3d 376, 678 N.E.2d 537 (1997), where the parents of the deceased child filed a declaratory judgment action seeking to have the trial court direct the coroner to change the manner of death.

**{¶115}** Neither *Perez* nor R.C. 313.19 direct a hearing when, as here, the coroner amends the autopsy report on his own. Thus, the hearing requirement under R.C. 313.19 was not implicated. The sixth assignment of error is overruled.

## I. Preindictment Delay

**{¶116}** In her final assignment of error, McFeeture contends that her rights were violated by undue preindictment delay. She argues she was prejudiced by the lapse of six years between the death in July 2006 and the indictment issued in July 2012. McFeeture never raised this issue at the trial court level. Thus, we review for plain error.

**{¶117}** A defendant's due process rights can be violated by preindictment delay under certain circumstances. *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). "An unjustifiable delay between the commission of an offense and a defendant's indictment

therefor, which results in actual prejudice to the defendant, is a violation of the right to due process of law * * *." *State v. Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097 (1984), paragraph two of the syllabus.

{¶118} Courts apply a two-part test to determine whether preindictment delay constitutes a due process violation. The defendant has the initial burden to show that he was substantially and actually prejudiced due to the delay. *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998). The burden then shifts to the state to produce evidence of a justifiable reason for the delay. *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829. Thereafter, the due process inquiry involves a balancing test by the court, weighing the reasons for the delay against the prejudice to the defendant, in light of the length of the delay. *Id.* at ¶ 51.

{¶119} In reviewing preindictment delay, the determination of actual or substantial prejudice entails "a delicate judgment based on the circumstances of each case." *Id.* at ¶ 52. The court must consider "the evidence as it exists when the indictment is filed and the prejudice the defendant will suffer at trial due to the delay." *Id.* Prejudice is not presumed solely due to a lengthy delay. *State v. Copeland*, 8th Dist. Cuyahoga No. 89455, 2008-Ohio-234, ¶ 13. Further, the defendant may not rely on speculation or vague assertions of prejudice. *State v. Clemons*, 2013-Ohio-5131, 2 N.E.3d 930, ¶ 17 (8th Dist.). Rather, "proof of actual prejudice must be specific, particularized and non-speculative." *State v. Stricker*, 10th Dist. Franklin No. 03AP-746, 2004-Ohio-3557, ¶ 36.

{¶120} Specifically, a defendant must show how lost witnesses and physical evidence would have proven the defendant's asserted defense. *State v. Davis*, 7th Dist. Mahoning No. 05 MA 235, 2007-Ohio-7216, ¶ 17 ("Without proof of prejudice, meaning something which

adversely affects [a defendant's] ability to defend himself at trial, there is no due process violation for preindictment delay in prosecution.").

{¶121} Reviewing for plain error, we find none. We are not persuaded by McFeeture's contention that she was prejudiced because Drs. Balraj and Miller were no longer employed by the coroner's office at the time of trial. As we have discussed at length, medical examiner Dr. Galita performed the autopsy and was personally involved in the homicide investigation of the coroner's office. He provided lengthy testimony regarding both the change and manner of death and was subject to extensive cross-examination. We do not perceive any prejudice to McFeeture due to the absence of Balraj and Miller from trial.

{¶122} McFeeture also complains the Detective Bobby Moore, who was the lead detective in this case from 2006 to 2011 but had since retired, did not testify. Several police officers involved in this case provided testimony regarding their investigation. McFeeture does not demonstrate how the absence of Detective Moore prejudiced her.

{¶123} The record reflects that the homicide investigation in this case began immediately after the coroner's office released the autopsy report finding Podolak died of chronic intoxication. The investigation continued until the trial. There was no evidence that the state delayed the indictment to gain a tactical advantage. *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). The seventh assignment of error is without merit.

{¶124} In summary, this court is fully satisfied that the constitutional, statutory, and procedural rules of trial, all mandated to ensure due process, were fully complied with in this proceeding. Matthew Podolak's life was taken in 2006. From 2006 through the trial in 2013, the combined forces of forensic scientists and law enforcement investigators labored to ultimately present the evidence necessary to produce a just result.

{¶125} The rare and unique nature of the homicide of Matthew Podolak was such that careful forensic investigation over many months was necessary to identify the cause of his death. After that was achieved, years of investigation were required to determine that his death was homicide. These realities of the painstaking development of evidence over several years do not reflect weakness in the process and outcome — just the opposite. The quilt of evidence that led to the 2013 conviction was sewn together evermore strongly as the result of time and diligence. The history of evidentiary development in this case reflects forensic and legal craftsmanship, not procedural error.

{¶126} The jury returned a just verdict. We affirm their verdict today.

{¶127} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

KATHLEEN ANN KEOUGH, J., CONCURS;
LARRY A. JONES, SR., P.J., DISSENTS

LARRY A. JONES, SR., P.J., DISSENTING:

{¶128} I respectfully dissent. I believe that the admission of the 2010 amended autopsy report was plain error and trial counsel was ineffective for not objecting to it. I also believe that the trial court erred by not granting McFeeture's motion for a new trial. I would, therefore, reverse the conviction and remand the case for a new trial.

{¶129} My view of this case is informed, in large part, by three things. First, the time line of events. Podolak died in 2006. In January 2007, the autopsy report with Dr. Galita's findings was released. By 2008, the police had Kennedy's statement that McFeeture had confessed to him. In 2010, the autopsy report was amended. In 2011, McFeeture was indicted, but the state dismissed her case. In 2012, she was reindicted in this case.

{¶130} Second, after careful review of the record, it is clear to me that from the time of Podolak's death in 2006, his family and friends believed McFeeture was the perpetrator, and mounted an aggressive campaign for law enforcement to bring her to justice.

{¶131} Third, this was not an open and shut case. It involved a death for which the cause was not widely researched in the medical community. There was no physical evidence tying McFeeture to the death. The state's "star witness," Kennedy, was saddled with credibility issues. The defense's theory of the case — that Podolak had committed suicide — was not completely preposterous: Podolak had been depressed, sought treatment, and was taking medications for his depression.

{¶132} That said, I understand that as it now stands, the law generally allows for the admission of an autopsy report and testimony regarding the report by an expert other than the person who prepared the report as a business record exception to hearsay under Evid.R. 803(6). But the admission is not absolute, and I believe that under the "primary purpose test," there may

be instances, such as here, where the admission of an autopsy report constitutes testimonial evidence.

{¶133} The primary purpose test "examines the reasons for and purpose of the record in question.

> To determine the primary purpose, a court must "objectively evaluat[e] the statements and action of the parties to the encounter" giving rise to the statements.

*State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 49, quoting *Michigan v. Byrant*, 562 U.S. ___, 131 S.Ct. 1143, 1162, 179 L.Ed.2d 93 (2011). "Simpler is not always better, and courts making a 'primary purpose' assessment should not be unjustifiably restrained from consulting all relevant information * * *." *Bryant* at *id.*

{¶134} After doing an objective evaluation of this record, I am left to conclude that the primary purpose of the amended autopsy report was for use at trial against McFeeture.

{¶135} In *Maxwell*, the expert, who did not perform the victim's autopsy, testified that he reached "his own independent judgment on the cause and manner of" the victim's death based on his analysis of the evidence in the autopsy report. *Id.* at ¶ 33, 53. The majority attempts to likewise find here that Dr. Galita reached his own independent judgment on the manner of Podolak's death. I believe that, when closely examined, the sum and substance of Dr. Galita's testimony as to Podolak's manner of death was "Dr. Miller made that determination." I am strained to find that he offered his own independent judgment on the manner of death.

{¶136} It is true that Dr. Galita testified that after the manner of death was ruled undetermined in the original autopsy report, he "immediately" requested a homicide investigation. But I fail to find that he offered any testimony that reasonably could be construed

that he formed an independent judgment to change the manner of death from undetermined to homicide.

{¶137} For example, Dr. Galita testified that the "homicide investigation brought us two bottles of antifreeze found in the garage * * *." Those two bottles of antifreeze were found in the garage of McFeeture's home at a time when *she no longer lived there*, and it was determined that *the antifreeze found in Podolak's system did not come from either of those two bottles*. To further complicate the matter, the antifreeze bottles were prominently displayed for the jury throughout the trial.

{¶138} Further, his vague testimony that he had "valuable information from different other persons, [who] were interviewed in relation with this case," without elaboration, leaves me with the conclusion that Dr. Galita did not know any more about the manner of death at the time he testified than he did in 2007 when he ruled it undetermined. I am at a loss to find what the "additional information" was, other than mounting pressure from Podolak's family and friends. In short, his testimony as to the manner of death reads to me like "I had a hunch it was homicide in 2007 and I still have the same hunch." Mere hunches, however, do not pass constitutional muster.

{¶139} I understand the evidentiary concerns that arise with autopsy reports, such as the expert who conducted the autopsy being deceased or otherwise unavailable at the time of trial, and the impossibility of a second autopsy being performed in some instances because of cremation or the passage of time. But I am not advocating for a blanket reversal of the law governing their admission. Rather, I am merely expressing my opinion that, under the particular circumstances of this case, McFeeture was not afforded, as guaranteed by the Sixth Amendment's Confrontation Clause, her "right * * * to be confronted with the witnesses against"

her as it related to the amended autopsy report. I am unable to find that this was not a manifest miscarriage of justice.

{¶140} Thus, I think admission of the amended autopsy report without the testimony of Dr. Miller to explain, and be subjected to cross-examination on, what exactly was different from 2007 to 2010 to cause the change in Podolak's manner of death, was plain error. I also think counsel was ineffective for not challenging the admission of the amended report on this ground.

{¶141} In addition to finding that McFeeture's right to confront her accusers was violated, I also believe that her motion for a new trial should have been granted. The majority writes that the "undisclosed information that Kennedy was an informant in another case was no doubt significant. It might have been utilized as impeachment evidence. To enhance fairness, it should have been provided to the defense." I agree with the majority's statements, with one alteration: it would have been used as impeachment evidence. I am unable to say that the withheld information was merely cumulative, and that the result of the trial would not have been different had the defense been able to cross-examine Kennedy about his testimony in another murder trial.

{¶142} For the reasons stated above, I dissent.