[Cite as *State v. Dickerson*, 2016-Ohio-807.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 102461

---

**STATE OF OHIO**

PLAINTIFF-APPELLANT/
CROSS-APPELLEE

vs.

**OSCAR DICKERSON**

DEFENDANT-APPELLEE/
CROSS-APPELLANT

---

**JUDGMENT:**
VACATED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-585521-A

**BEFORE:** Jones, A.J., Stewart, J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** March 3, 2016

**ATTORNEYS FOR APPELLANT/CROSS-APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Daniel T. Van
        Mary Weston
Assistant County Prosecutors
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113


**ATTORNEY FOR APPELLEE/CROSS-APPELLANT**

Patricia J. Smith
9088 Superior Avenue, Suite 105
Streetsboro, Ohio 44241

LARRY A. JONES, SR., A.J.:

**{¶1}** In May 2014, defendant-appellee/cross-appellant, Oscar Dickerson, was indicted on several counts stemming from a July 1994 rape allegation and associated crimes.[1] In July 2014, by agreement of the parties, trial was set for August 27, 2014. However, upon Dickerson's motion, the trial date was reset for November 12, 2014. On November 5, 2014, Dickerson filed a motion to dismiss based on preindictment delay; the motion was denied as untimely.

**{¶2}** The case proceeded to a jury trial, and after its deliberations, the jury convicted Dickerson of one count each of rape, complicity, and kidnapping. The trial court sentenced Dickerson to an aggregate five-year sentence. The sentence was imposed under the current sentencing regime, Am.H.B. No. 86, which became effective on September 30, 2011.

**{¶3}** Plaintiff-appellant/cross-appellee, the state of Ohio, has appealed, contending that the trial court erred by ordering a definite term of incarceration under the present sentencing regime because Dickerson would have been subject to an indefinite sentence under the sentencing regime as it existed at the time he committed the offenses.

**{¶4}** Dickerson has cross-appealed, contending that the trial court erred in denying his motion to dismiss; he also contends that his trial counsel was ineffective for not timely filing it. Further, Dickerson contends that the evidence was insufficient to support his convictions.

**{¶5}** For the reasons set forth below, we find merit to Dickerson's ineffective assistance of counsel claim, and vacate his conviction under it. The state's assignment of error is therefore moot.

## I. Facts

---

[1] A codefendant, Michael Jenkins, was also indicted and jointly tried with Dickerson. He appealed, raising the same assignment of error as Dickerson relative to sentencing. His sentence was affirmed. *State v. Jenkins*, 8th Dist. Cuyahoga No. 102462, 2015-Ohio-4583.

{¶6} The following facts were elicited at trial. The victim, J.R., testified that on the date of the incident, July 2, 1994, she was 16 years old. That day and into the evening, she had been with her boyfriend at his house. J.R. testified that her family life was troubled at the time, and she was "living recklessly."[2] She testified that on the day in question, she had been drinking and smoking marijuana and was under the influence. She left her boyfriend's house sometime after midnight to walk an approximate 40-minute walk to her home, where she lived with her mother and siblings; her boyfriend walked her part of the way home.

{¶7} J.R. testified that after her boyfriend left her, and while walking alone, a car, with three males inside, approached her while she was on West 140th Street in Cleveland. She was near her home at that time; her house was approximately an eight- to ten-minute walk, or a four-minute run, away.

{¶8} The males in the car called out to her as the car drove past her. The driver then "circled back" a few times. J.R. testified that she "waved them off." However, as she approached Puritas Road, the car pulled over by a library. The victim testified that inside the car there were two younger black males, and one older white male, who was driving the car; she denied knowing any of them.

{¶9} J.R. testified that she walked off the sidewalk and tried to cut through an open area to avoid the men, but one of the males got out of the car. She stopped walking while the man approached her. The male offered her a ride home, which she declined, but when he persisted, she, "not thinking," got in the car. J.R. testified that she accepted the ride because she was scared. It was approximately 1:30 a.m. when she got in the car.

---

[2]At the time of this incident, J.R. had been adjudicated unruly and was on probation. Her father had been imprisoned for sexually molesting her, but, as J.R. testified, "[t]hanks to the old law and shock parole," he had been released early. He was not living with J.R. and her family at the time of this incident, however.

{¶10} Once in the car, she told the men where she lived, but the driver drove the car past her street. The victim testified that she protested, but the men ignored her. They eventually arrived at a hotel.

{¶11} J.R. testified that the car was parked in a manner so that the hotel clerk could not see that she was in the car. The white male went into the hotel to rent a room, while the two black males stayed in the car with her. When the white male returned, the two black males walked J.R. into the hotel through a back entrance, and took her to a room. Meanwhile, the white male had driven off. Records indicate that the white male, later identified as Jerry Polivka, rented the room at approximately 4:42 a.m. The victim was unable to recall what had happened between 1:30 a.m. when the males picked her up until 4:42 a.m. when the room was rented.

{¶12} J.R. testified that she tried to think of a way to get out of the situation. She asked to go outside to smoke a cigarette, hoping to escape, but one of the males went with her and even gave her crack cocaine to put on the end of her cigarette; she smoked the cigarette with the crack on it to "numb" herself for what she believed "was going to happen" so that she would not remember it. The victim testified that she was never left alone during the whole incident. One of the males told J.R. that his name was "Mike" and the other said he went by "O"; the victim testified that "O" said his real name was "Oscar."

{¶13} After J.R. finished smoking, she and the male went back into the hotel room. J.R. went into the bathroom, and "Mike" followed her. J.R. testified that "Mike" began to take her clothes off, and she "weakly" protested, but "he wasn't hearing what [she] said." She told him that she could not have sex because she had a boyfriend and she might be pregnant. The victim testified that after telling "Mike" about having a boyfriend and possibly being pregnant, she "just

kind of went dead; [she] put her mind in another place and * * * didn't respond or talk; [she] didn't do anything." J.R. testified that "Mike" then vaginally raped her. She testified that, although she had tried to push "Mike" away, she did not hit or kick him, or scream, because she feared that she would make the situation worse and he would hurt her if she fought back.

{¶14} J.R. testified that after "Mike" raped her, she put her clothes back on, and returned to the living area of the hotel room, unsure about what she should do next. There were not any lights on in the room, and the only illumination was from the television, which was on. "O" was in the living area, and he took her clothes off and vaginally raped her on the bed. The victim testified that she did not say anything during the rape, but she was crying. She explained that, like with the encounter with "Mike," she "just tried to kind of put [her] mind in a different place, and * * * didn't fight or hit or kick or any of those things." J.R. testified that although she cried during the rape, because the room was mainly dark, "O" might not have known she was crying.

{¶15} After "O" raped her, J.R. went to the bathroom again. "Mike" followed her and vaginally raped her again. "Mike" told her to "wash up, get comfortable because you are going to be here for a while." "Mike" left the bathroom and J.R. stayed in the bathroom to wash up and get her clothes back on. She testified that she believed she took a shower, although neither man had specifically directed her to do so.

{¶16} When she returned to the living area, it appeared that both males were asleep. She watched them for a little bit, to make sure they were asleep, and after she decided that they were, she escaped. J.R. testified that she ran from the hotel to her home. Once inside her home, she attempted to "run upstairs to the bathroom," but her mother, who was angry, confronted her and demanded to know where she had been. J.R. told her mother what had

happened.

{¶17} Her mother testified to a different version of events, however. According to her mother, she was sitting out on the front porch enjoying the nice weather when J.R. returned home sometime between 8:00 a.m. and 9:00 a.m. J.R. did not appear to be intoxicated when she returned home, but she looked "somber and broken"; her mother testified that she had never seen her like that before.

{¶18} Because of the mother and J.R.'s "very troubled relationship," usually when J.R. would come home after having been out all night, she would avoid her mother and just run to her room or go to get something to eat. But her mother testified that this time J.R. came and sat down with her on the front porch and looked like she wanted to talk. The mother testified that she (the mother) "just sat there and * * * looked at her, and she told me what had happened the previous night." J.R. and her mother immediately reported the incident to the police.

{¶19} Officer William Neider ("Officer Neider") of the Cleveland Police responded to the home. J.R. gave Officer Neider a description of "O" and "Mike," and told him where the incident had occurred, even giving him the room number at the hotel. The officer advised J.R. to go the hospital, and he and his partner went to the hotel to investigate.

{¶20} When the officers arrived at the hotel, an employee took them to the room, and knocked and announced that if the door was not opened she would unlock it. After receiving no response, the employee unlocked the door. The two suspects, "O" and "Mike," were inside sleeping. The police awakened and arrested them. They were startled, but cooperative. The police learned that Jerry Polivka was the man who had driven them to the hotel and rented the room.

{¶21} Meanwhile, at the hospital, J.R. told the emergency room nurse who treated her

that she had been "pushed around" and raped by two males at a hotel. Specifically, J.R. said that as she was walking home, the men approached her and invited her to a party at a hotel, which she declined. Upon declining, the "men grabbed her arm and pushed her into the back of the car."

{¶22} J.R. told the nurse that the sexual assaults included both vaginal and oral intercourse, and told the nurse that she "choked and gagged" after the oral intercourse. She also told the nurse that one of the men attempted anal intercourse, but she screamed and he stopped. J.R. testified that she was honest with the nurse, and that the discrepancies with what she told the nurse vis-a-vis her trial testimony was due to her not remembering everything at trial because of the passage of time, during which she tried to forget the whole event.

{¶23} The nurse noted in her report that J.R. was "moderately tearful," "moderately calm," with no signs of acute distress. The nurse noted, however, that the victim was apprehensive during the pelvic exam and would "jump" when she was touched. The victim told the nurse that the first man had vaginal intercourse with her and the second man had oral intercourse with her. According to the nurse, J.R. did not appear to be intoxicated. A pregnancy test taken at the hospital revealed that J.R. was not pregnant at that time.

{¶24} When she was finished at the hospital, J.R. and her mother went to the justice center where they met with a female detective. J.R. testified that the detective was "very rude," and gave her opinion of the incident. Feeling humiliated, J.R. told the detective to "forget it if she wasn't going to help." However, her mother testified that they were "[t]reated with respect [and] taken seriously" during their meeting with the detective. The detective marked the file with code words indicating that no further investigation was to be had.

{¶25} A few days after the rapes, J.R. was walking to her boyfriend's house when "Mike"

pulled up alongside her. The victim testified that he was "angry," "threatened her," and "forced" her to sign a note recanting the incident. J.R. signed the note, but then immediately reported the incident to the police. The police made an intimidation report, but, according to J.R., never followed up with her. J.R. testified that she just wanted to "get on with her life." Shortly after the incident, J.R. learned that she was pregnant and, as her mother testified, J.R. "started focusing on being excited about having a baby."

{¶26} In August 2012, the victim's rape kit was sent out for testing as part of the attorney general's sexual assault kit testing initiative. Dickerson's DNA was on a vaginal swab and Jenkins's DNA was on clothing J.R. had been wearing the day of the incident. The case was reopened and assigned to Detective Timothy Clark ("Detective Clark"), who had not originally been involved in the case. J.R. was contacted by Detective Clark. She was shown a photo array, and picked Jenkins as one of the perpetrators, but did not pick Dickerson. In 2014, Dickerson was indicted. Polivka, the driver on the evening in question, was deceased at the time of indictment.[3]

{¶27} On this evidence the jury found Dickerson guilty of one count each of rape, complicity, and kidnaping. The trial court sentenced him to a five-year prison term under the present sentencing regime. The state presents the following assignment of error for our review: "Because Defendant-Appellee committed his offenses prior to July 1, 1996, the trial court erred when it sentenced Defendant-Appellee under sentencing provisions effective July 1, 1996 and H.B. 86 provisions effective September 30, 2011."

{¶28} In his cross-appeal, Dickerson presents the following three assignments of error for

---

[3]The record does not indicate exactly when Polivka died, but Jenkins's counsel indicated that she believed it was in 2007.

our review:

[I.] The trial court erred when it failed to dismiss the case for pre-indictment delay.

[II.] Trial counsel provided ineffective assistance of counsel for failing to timely file a motion to dismiss for pre-indictment delay.

[III.] The state failed to meet its burden where there was not sufficient evidence of force or threat of force to sustain a conviction for rape, complicity to rape, and kidnapping pursuant to [R.C.] 2907.02(A)(2), 2905.01(A)(4) and 2923.03(A)(2).

## II. Law and Analysis

**State's Appeal Moot**

{¶29} For the reasons set forth below, we find merit to Dickerson's appeal, which renders the state's assignment of error moot. We therefore overrule the state's sole assignment of error.

**Dickerson's Appeal**

**Preindictment Delay and Ineffective Assistance of Counsel**

{¶30} Dickerson's trial counsel filed a motion to dismiss based on preindictment delay on November 5, 2014, one week before the case went to trial. The trial court denied the motion as untimely. In his first assignment of error, Dickerson contends that the trial court erred in denying his motion. In his second assignment of error, Dickerson contends that his counsel was ineffective for not timely filing the motion.

{¶31} Crim.R. 12 governs pretrial pleadings and motions in criminal cases. The rule provides that pretrial motions "shall be made within thirty-five days after arraignment or seven days before trial, whichever is earlier. The court in the interest of justice may extend the time for making pretrial motions." Crim.R. 12(D). Dickerson was arraigned on June 6, 2014, and therefore, under Crim.R. 12(D), his motion to dismiss should have been filed in July 2014.

{¶32} We consider whether, in the interest of justice, the trial court should have extended

the time for the filing of the motion to dismiss. The trial court's decision whether to permit leave to file an untimely pretrial motion is within its sound discretion. *Akron v. Milewski*, 21 Ohio App.3d 140, 142, 487 N.E.2d 582 (9th Dist.1985). Our review is, therefore, limited to whether the trial court abused its discretion in rendering its decision. *Id.* An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). When applying an abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621, 614 N.E.2d 748 (1993).

{¶33} The trial court questioned Dickerson's counsel about the untimeliness of his motion. Counsel responded that he had just recently learned that the driver, Jerry Polivka, was deceased. He also stated that he filed his motion based on a then-recent decision from this court, *State v. Mack*, 8th Dist. Cuyahoga No. 100965, 2014-Ohio-4817, *appeal not accepted*, 143 Ohio St.3d 1480, 2015-Ohio-3958, 38 N.E.3d 901.

{¶34} The assistant prosecuting attorney responded that the defense was advised of Polivka's death in the state's initial discovery response. The court responded that *Mack* did not change the law on preindictment delay, a finding with which we agree, and moreover, that *Mack* was not even mentioned in the written motion to dismiss, another true finding. Defense counsel did not dispute the state's claim that the defense was advised of Polivka's death at the early stages of this case.[4]

{¶35} On this record, we do not find that the trial court abused its discretion in denying

---

[4]The state initially provided the defense with discovery on June 12, 2014. That discovery included a photo identification of Polivka (as picked by the victim from an array), a March 2014 investigative report (which the state claimed reported that Polivka was deceased), and the initial police report. Further, Polivka was not listed as a witness whom the state intended to call at trial.

the motion to dismiss as untimely. The first assignment is therefore overruled, and we next consider whether counsel was ineffective for failing to timely file the motion to dismiss.

{¶36} In order to successfully maintain an ineffective assistance of counsel claim, a defendant must demonstrate that counsel's performance was deficient and that he was prejudiced by counsel's deficient performance; that is, there is a reasonable probability that but for counsel's unprofessional errors the result of the trial or proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), paragraph two of the syllabus. Thus, in order to be successful here, Dickerson must demonstrate that his trial counsel performed deficiently by failing to timely raise the claim he now presents, and that there was a reasonable probability of success had counsel timely presented that claim to the trial court. *State v. Mack*, 101 Ohio St.3d 397, 2004-Ohio-1526, 805 N.E.2d 1108, ¶ 31.

{¶37} Under some circumstances, the delay between the commission of an offense and an indictment can constitute a violation of due process of law guaranteed by the federal and state constitutions. *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *State v. Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097 (1984), paragraph two of the syllabus.

{¶38} Courts apply a two-part test in considering whether preindictment delay constitutes a due process violation. First, the defendant has the burden to show that he was substantially and actually prejudiced due to the delay. *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998). However, "proof of actual prejudice, alone, will not automatically validate a due process claim" as "the prejudice suffered by the defendant must be viewed in light of the state's reason for the delay." *Luck* at 154, citing *Marion*. Thus, once the defendant establishes "actual prejudice," the second part of the test shifts the burden to the state to produce evidence of

a justifiable reason for the delay. *Luck* at *id.* Thereafter, the due process inquiry involves a balancing test by the court, weighing the reasons for the delay against the prejudice to the defendant, in light of the length of the delay. *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 51.

{¶39} "The determination of 'actual prejudice' involves 'a delicate judgment based on the circumstances of each case.'" *Id.* at ¶ 52, quoting *Marion* at 325. Thus, prejudice is not presumed solely because of a lengthy delay. *State v. Copeland*, 8th Dist. Cuyahoga No. 89455, 2008-Ohio-234, ¶ 13. In determining whether a defendant suffered actual prejudice based on preindictment delay, courts have generally required a defendant to demonstrate that any missing evidence or lost witnesses were nonspeculative and exculpatory. *See, e.g., State v. McFeeture*, 2014-Ohio-5271, 24 N.E.3d 724, ¶ 119 (8th Dist.); *State v. Clemons*, 2013-Ohio-5131, 2 N.E.3d 930, ¶ 17 (8th Dist.); *State v. Stricker*, 10th Dist. Franklin No. 03AP-746, 2004-Ohio-3557, ¶ 36.

{¶40} In *Luck*, the Ohio Supreme Court evaluated the defendant's claim of actual prejudice as follows:

> The prejudicial factors enumerated by defense counsel (the deaths of witnesses, the fading memories, and the loss of evidence), when balanced against the other admissible evidence in this case, show that the defendant has suffered actual prejudice by the fifteen-year delay in prosecution. Although the state is in possession of circumstantial evidence which may link the defendant to [the victim's] death, it cannot be said that the missing evidence or the dead witness would not have minimized or eliminated the impact of the state's circumstantial evidence. * * * [T]he defendant * * * is obviously prejudiced by not being able to seek verification of her story from [a deceased witness] and thereby establish

mitigating factors or a defense to the charge against her.

*Id.* at 157-158.

{¶41} The Ohio Supreme Court used its standard set forth in *Luck* again in *State v. Whiting*, 84 Ohio St.3d 215, 702 N.E.2d 1199 (1998), and found that the defendant suffered actual prejudice by a 14-year delay in prosecution, when the defendant had been a suspect as a result of the initial investigation. Both *Luck* and *Whiting* were discussed in Dickerson's written motion to dismiss.

{¶42} Upon review, we find that counsel was deficient for not timely raising the issue of preindictment delay and that there was a reasonable probability of success had it been timely raised.

{¶43} Dickerson had a strong, viable claim of actual prejudice based in particular on the unavailability of Polivka. The victim got into the car with the defendants at approximately 1:30 a.m.; the hotel room was not rented by Polivka until approximately 4:42 a.m. The victim was completely unable to remember what had occurred in that time period between getting into the car and arriving at the hotel. This was of concern to at least one juror, who questioned, "[w]hat happened in the time period from 1:30 a.m. to 4:42 a.m.?"

{¶44} The state contends that Dickerson would not have been able to demonstrate prejudice relative to the unavailability of Polivka because if he were still alive, "he would have been indicted and would have been sitting next to [Dickerson] at the defense table for trial. In that situation, [Dickerson] would not have had a right to call Polivka as a witness at trial."

{¶45} During his testimony, Officer Neider stated that, although he had Polivka's name and an address for him, he did not attempt to contact him. A juror wondered about that, questioning "why wasn't the driver considered an accomplice on the commission of this crime or

these crimes?" Neider answered, "because at the time his involvement as far as he went to the hotel, rented the room, gave the two black male suspects the keys, and he was no longer involved in the actual incident in the hotel. He left." We recognize that the police do not decide whether to indict, but, nonetheless, the testimony from the state's own witness does not support its contention.

{¶46} That aside, even if Polivka had been alive and indicted, the state's contention that Dickerson would not have been able to question him is purely speculation — it is possible that Dickerson could have had the opportunity to question Polivka. For example, if Polivka had been indicted, he certainly could have pled guilty to any charges and testified against Dickerson and Jenkins in hopes of consideration of his testimony at sentencing, in which case, Dickerson would have had the opportunity to cross-examine him. Thus, we are not persuaded by the state's logic.

{¶47} On this record, we find that Dickerson had a reasonable probability of success in demonstrating actual and substantial prejudice. To summarize, a key witness who was with the victim for a number of hours was unavailable, and the victim herself was unable to account for the time.

{¶48} Further, under the second part of the preindictment delay test, we find that Dickerson would have had a reasonable probability of success on his motion given the state's reason for the delay. The state contends that the delay was investigative. We find that that argument reasonably could have failed for two reasons.

{¶49} First, the state contends that the Cleveland Police Department did not do DNA testing in 1994, so the "case would have gone to trial with no DNA evidence to corroborate the victim's claim that sexual activity occurred." It is true that a representative from the police

department's lab testified that the department did not do DNA testing in 1994. But it is common knowledge that such testing was available at that time and thus, if the case had not been closed, the police department would have sent the evidence to an outside source for testing. Further, the representative testified that the department started doing DNA testing in either 1999 or 2000.

{¶50} Second, the state contends that the delay was investigative because it was unable to secure J.R.'s cooperation. The record here demonstrates that J.R. reached out to the police in the days after the incident by reporting the alleged instance of intimidation by "Mike." Despite that attempt by J.R., the state never did anything to further pursue the case. For all practical purposes, the state closed the case in 1994 after the victim's meeting with the detective immediately following the incident, and did not do any further investigation and, then, in 2014, with the same evidence it had in 1994, decided to commence its prosecution. As the Ohio Supreme Court warned, compiling evidence, but simply failing or refusing to take action for a substantial period of time, is not justifiable investigative delay. *State v. Walls*, 96 Ohio St.3d 437, 454, 775 N.E.2d 829 (2002).

{¶51} In light of the above, we find that counsel was deficient for not timely filing the motion to dismiss and that there was a reasonable probability that it would have been granted had it been timely filed.

{¶52} Further, although it was not decided at the time of the pretrial proceedings in this case, we note this court's recent en banc decision in *State v. Jones*, 8th Dist. Cuyahoga No. 101258, 2015-Ohio-2853. In *Jones*, this court analyzed a claim of preindictment delay under the "concepts of due process and fundamental justice," and found that under the circumstances presented in that case, the defendant suffered actual prejudice due to a nearly 20-year

preindictment delay. *Id.* at ¶ 47.

{¶53} In *Jones*, the identity of the defendant was known immediately after the alleged crime. Here, Dickerson was arrested right after the crime, but was released. Thus, the testing of the DNA evidence years later in *Jones* and in this case did nothing to "advance the case," in terms of identifying the perpetrator. *Id.* at ¶ 42. Further, as was the case in *Jones*, Dickerson contends that, because of the years delay in prosecuting the case, a key witness was unavailable. Specifically, here, Polivka, the driver, was deceased. Moreover, the hotel clerk was no longer available.

## III.   Conclusion

{¶54} Having found that trial counsel was ineffective by not filing a timely motion to dismiss on the ground of preindictment delay, the conviction against Dickerson is vacated. Dickerson's first assignment of error is overruled, and his third assignment of error is moot. The state's assignment of error is moot and therefore overruled.

{¶55} Case remanded to the trial court to vacate appellant's conviction.

It is ordered that appellee/cross-appellant recover of appellant/cross-appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

LARRY A. JONES, SR., ADMINISTRATIVE JUDGE

PATRICIA ANN BLACKMON, J., CONCURS
MELODY J. STEWART, J., DISSENTS WITH
SEPARATE OPINION

MELODY J. STEWART, J., DISSENTING:

{¶56} I disagree with the majority that Dickerson met his burden of proving actual prejudice for his claim of preindictment delay. Dickerson's two arguments for actual prejudice are that Polivka was an essential defense witness who was unavailable to testify at the time of trial because of his death, and second, that the victim has faded memories. Dickerson has altogether failed to inform the court what Polivka would have testified to at trial, let alone explain how that testimony would have been beneficial to him such that a jury would have likely acquitted him. Indeed, according to the victim's testimony, Polivka left soon after paying for the motel room and was not present at any time during the alleged rapes. Therefore, it is difficult to conclude anything other than that Polivka's testimony would have been completely irrelevant to the findings of guilt on the rape charges.

{¶57} Polivka's testimony might have been relevant to the kidnaping counts because the state argued that the kidnaping derived from the fact that the men deceived J.R. by luring her into their vehicle with the promise of giving her a ride home. However, there is nothing in the record that indicates what Polivka might have said and therefore any exculpatory testimony he might have given is entirely speculative. As the majority acknowledges *supra* at ¶ 39, mere speculation as to what a witness might have said, without more is insufficient evidence of prejudice. *Accord State v. Owens*, 8th Dist. Cuyahoga No. 102276, 2015-Ohio-3881, ¶ 4 (stating, "this court has made it clear that speculation does not show actual prejudice[,]" citing *State v. Thomas*, 8th Dist. Cuyahoga No. 101202, 2015-Ohio-415, ¶ 11; *State v. McFeeture*,

2014-Ohio-5271, 24 N.E.3d 724, ¶ 120 (8th Dist.)).

{¶58} Furthermore, Dickerson fails to explain how the victim's faded memories prejudiced him. At trial, the victim could not remember a three-hour interval between the time when she got into the car and when she arrived at the motel. If anything, the victim's faded memory was more harmful to the state. I therefore dissent from the decision to vacate Dickerson's conviction.