[Cite as *State v. Dickerson*, 2017-Ohio-177.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 102461**

---

## STATE OF OHIO

PLAINTIFF-APPELLANT/
CROSS-APPELLEE

vs.

## OSCAR DICKERSON

DEFENDANT-APPELLEE/
CROSS-APPELLANT

---

### JUDGMENT:
REVERSED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-585521-A

**BEFORE:** Jones, P.J., Stewart, J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** January 19, 2017

**ATTORNEYS FOR APPELLANT/CROSS-APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

BY: Daniel T. Van
       Brett Hammond
       Mary Weston
Assistant County Prosecutors
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113


**ATTORNEY FOR APPELLEE/CROSS-APPELLANT**

Robert L. Tobik
Cuyahoga County Public Defender

BY:   Erika B. Cunliffe
Assistant Public Defender
9088 Superior Avenue, Suite 105
Streetsboro, Ohio 44241

Patricia J. Smith
9088 Superior Avenue, Suite 105
Streetsboro, Ohio 44241

LARRY A. JONES, SR., P.J.:

{¶1} This opinion is issued after the case was remanded to this court from the Ohio Supreme Court. *State v. Dickerson*, 146 Ohio St.3d 1493, 2016-Ohio-5585, 57 N.E.3d 1172. This court's original opinion was set forth in *State v. Dickerson*, 8th Dist. Cuyahoga No. 102461, 2016-Ohio-807. The state sought to appeal this court's original judgment, but the Ohio Supreme Court declined to accept the appeal. *State v. Dickerson*, 146 Ohio St.3d 1428, 2016-Ohio-4606, 53 N.E.3d 1203. However, after the Supreme Court issued its opinion in *State v. Jones*, Slip Opinion 2016-Ohio-5105, dealing with the issue of preindictment delay, an issue in this case, the state filed a motion for reconsideration with the Supreme Court and the court granted it. *Dickerson*, 146 Ohio St.3d 1493, 2016-Ohio-5585, 57 N.E.3d 1172. The Supreme Court vacated our original decision and remanded the case for us to apply *Jones*. *Id.*

## I. Procedural History

{¶2} In May 2014, defendant-appellee/cross-appellant, Oscar Dickerson ("Dickerson"), was indicted on several counts stemming from a July 1994 rape allegation and associated crimes.[1] In July 2014, by agreement of the parties, trial was set for August 27, 2014. However, upon Dickerson's motion, the trial date was reset for November 12, 2014. On November 5, 2014, Dickerson filed a motion to dismiss based

---

[1] A codefendant, Michael Jenkins ("Jenkins"), was also indicted and jointly tried with Dickerson. He appealed, raising the same assignment of error as Dickerson relative to sentencing. His sentence was affirmed. *State v. Jenkins*, 8th Dist. Cuyahoga No. 102462, 2015-Ohio-4583.

on preindictment delay; the motion was denied as untimely.

{¶3} The case proceeded to a jury trial, and after its deliberations, the jury convicted Dickerson of one count each of rape, complicity, and kidnapping. The trial court sentenced Dickerson to an aggregate five-year sentence. The sentence was imposed under the current sentencing regime, Am.H.B. No. 86, which became effective on September 30, 2011.

{¶4} Plaintiff-appellant/cross-appellee, the state of Ohio, has appealed, contending that the trial court erred by ordering a definite term of incarceration under the present sentencing regime because Dickerson would have been subject to an indefinite sentence under the sentencing regime as it existed at the time he committed the offenses.

{¶5} Dickerson has cross-appealed, contending that the trial court erred in denying his motion to dismiss; he also contends that his trial counsel was ineffective for not timely filing it. Further, Dickerson contends that the evidence was insufficient to support his convictions.

{¶6} For the reasons set forth below, we find merit to Dickerson's ineffective assistance of counsel claim, and reverse his conviction under it. The state's assignment of error is therefore moot.

## II. Facts

{¶7} The following facts were elicited at trial. The victim, J.R., testified that on the date of the incident, July 2, 1994, she was 16 years old. That day and into the evening, she had been with her boyfriend at his house. J.R. testified that her family life

was troubled at the time, and she was "living recklessly."[2]   She testified that on the day in question, she had been drinking and smoking marijuana and was under the influence. She left her boyfriend's house some time after midnight to walk an approximate 40-minute walk to her home, where she lived with her mother and siblings; her boyfriend walked her part of the way home.

{¶8} J.R. testified that after her boyfriend left her, and while walking alone, a car, with three males inside, approached her while she was on West 140th Street in Cleveland.  She was near her home at that time; her house was approximately an eight- to ten-minute walk, or a four-minute run, away.

{¶9} The males in the car called out to her as the car drove past her.   The driver then "circled back" a few times.   J.R. testified that she "waved them off."   However, as she approached Puritas Road, the car pulled over by a library.   The victim testified that inside the car there were two younger black males, and one older white male, who was driving the car; she denied knowing any of them.

{¶10} J.R. testified that she walked off the sidewalk and tried to cut through an open area to avoid the men, but one of the males got out of the car.   She stopped walking while the man approached her.   The male offered her a ride home, which she declined, but when he persisted, she, "not thinking," got in the car.   J.R. testified that she accepted

---

[2]At the time of this incident, J.R. had been adjudicated unruly and was on probation.   Her father had been imprisoned for sexually molesting her, but, as J.R. testified, "[t]hanks to the old law and shock parole," he had been released early.   He was not living with J.R. and her family at the time of this incident, however.

the ride because she was scared.   It was approximately 1:30 a.m. when she got in the car.

{¶11} Once in the car, she told the men where she lived, but the driver drove the car past her street.   The victim testified that she protested, but the men ignored her. They eventually arrived at a hotel.

{¶12} J.R. testified that the car was parked in a manner so that the hotel clerk could not see that she was in the car.   The white male went into the hotel to rent a room, while the two black males stayed in the car with her.   When the white male returned, the two black males walked J.R. into the hotel through a back entrance, and took her to a room.   Meanwhile, the white male had driven off.   Records indicate that the white male, later identified as Jerry Polivka ("Polivka"), rented the room at approximately 4:42 a.m.   The victim was unable to recall what had happened between 1:30 a.m. when the males picked her up until 4:42 a.m. when the room was rented.

{¶13} J.R. testified that she tried to think of a way to get out of the situation.   She asked to go outside to smoke a cigarette, hoping to escape, but one of the males went with her and even gave her crack cocaine to put on the end of her cigarette; she smoked the cigarette with the crack on it to "numb" herself for what she believed "was going to happen" so that she would not remember it.   The victim testified that she was never left alone during the whole incident.   One of the males told J.R. that his name was "Mike" and the other said he went by "O"; the victim testified that "O" said his real name was "Oscar."

{¶14} After J.R. finished smoking, she and the male went back into the hotel room.

J.R. went into the bathroom, and "Mike" followed her. J.R. testified that "Mike" began to take her clothes off, and she "weakly" protested, but "he wasn't hearing what [she] said." She told him that she could not have sex because she had a boyfriend and she might be pregnant. The victim testified that after telling "Mike" about having a boyfriend and possibly being pregnant, she "just kind of went dead; [she] put her mind in another place and * * * didn't respond or talk; [she] didn't do anything." J.R. testified that "Mike" then vaginally raped her. She testified that, although she had tried to push "Mike" away, she did not hit or kick him, or scream, because she feared that she would make the situation worse and he would hurt her if she fought back.

{¶15} J.R. testified that after "Mike" raped her, she put her clothes back on, and returned to the living area of the hotel room, unsure about what she should do next. There were not any lights on in the room, and the only illumination was from the television, which was on. "O" was in the living area, and he took her clothes off and vaginally raped her on the bed. The victim testified that she did not say anything during the rape, but she was crying. She explained that, like with the encounter with "Mike," she "just tried to kind of put [her] mind in a different place, and * * * didn't fight or hit or kick or any of those things." J.R. testified that although she cried during the rape, because the room was mainly dark, "O" might not have known she was crying.

{¶16} After "O" raped her, J.R. went to the bathroom again. "Mike" followed her and vaginally raped her again. "Mike" told her to "wash up, get comfortable because you are going to be here for a while." "Mike" left the bathroom and J.R. stayed

in the bathroom to wash up and get her clothes back on. She testified that she believed she took a shower, although neither man had specifically directed her to do so.

{¶17} When she returned to the living area, it appeared that both males were asleep. She watched them for a little bit, to make sure they were asleep, and after she decided that they were, she escaped. J.R. testified that she ran from the hotel to her home. Once inside her home, she attempted to "run upstairs to the bathroom," but her mother, who was angry, confronted her and demanded to know where she had been. J.R. told her mother what had happened.

{¶18} Her mother testified to a different version of events, however. According to her mother, she was sitting out on the front porch enjoying the nice weather when J.R. returned home sometime between 8:00 a.m. and 9:00 a.m. J.R. did not appear to be intoxicated when she returned home, but she looked "somber and broken"; her mother testified that she had never seen her like that before.

{¶19} Because of the mother and J.R.'s "very troubled relationship," usually when J.R. would come home after having been out all night, she would avoid her mother and just run to her room or go to get something to eat. But her mother testified that this time J.R. came and sat down with her on the front porch and looked like she wanted to talk. The mother testified that she (the mother) "just sat there and * * * looked at her, and she told me what had happened the previous night." J.R. and her mother immediately reported the incident to the police.

{¶20} Officer William Neider ("Officer Neider") of the Cleveland Police

responded to the home. J.R. gave Officer Neider a description of "O" and "Mike," and told him where the incident had occurred, even giving him the room number at the hotel. The officer advised J.R. to go the hospital, and he and his partner went to the hotel to investigate.

{¶21} When the officers arrived at the hotel, an employee took them to the room, and knocked and announced that if the door was not opened she would unlock it. After receiving no response, the employee unlocked the door. The two suspects, "O" and "Mike," were inside sleeping. The police awakened and arrested them. They were startled, but cooperative. The police learned that Jerry Polivka was the man who had driven them to the hotel and rented the room.

{¶22} Meanwhile, at the hospital, J.R. told the emergency room nurse who treated her that she had been "pushed around" and raped by two males at a hotel. Specifically, J.R. said that as she was walking home, the men approached her and invited her to a party at a hotel, which she declined. Upon declining, the "men grabbed her arm and pushed her into the back of the car."

{¶23} J.R. told the nurse that the sexual assaults included both vaginal and oral intercourse, and told the nurse that she "choked and gagged" after the oral intercourse. She also told the nurse that one of the men attempted anal intercourse, but she screamed and he stopped. J.R. testified that she was honest with the nurse, and that the discrepancies with what she told the nurse vis-a-vis her trial testimony was due to her not remembering everything at trial because of the passage of time, during which she tried to

forget the whole event.

{¶24} The nurse noted in her report that J.R. was "moderately tearful," "moderately calm," with no signs of acute distress. The nurse noted, however, that the victim was apprehensive during the pelvic exam and would "jump" when she was touched. The victim told the nurse that the first man had vaginal intercourse with her and the second man had oral intercourse with her. According to the nurse, J.R. did not appear to be intoxicated. A pregnancy test taken at the hospital revealed that J.R. was not pregnant at that time.

{¶25} When she was finished at the hospital, J.R. and her mother went to the justice center where they met with a female detective. J.R. testified that the detective was "very rude," and gave her opinion of the incident. Feeling humiliated, J.R. told the detective to "forget it if she wasn't going to help." However, her mother testified that they were "[t]reated with respect [and] taken seriously" during their meeting with the detective. The detective marked the file with code words indicating that no further investigation was to be had.

{¶26} A few days after the rapes, J.R. was walking to her boyfriend's house when "Mike" pulled up alongside her. The victim testified that he was "angry," "threatened her," and "forced" her to sign a note recanting the incident. J.R. signed the note, but then immediately reported the incident to the police. The police made an intimidation report, but, according to J.R., never followed up with her. J.R. testified that she just wanted to "get on with her life." Shortly after the incident, J.R. learned that she was

pregnant and, as her mother testified, J.R. "started focusing on being excited about having a baby."

{¶27} In August 2012, the victim's rape kit was sent out for testing as part of the attorney general's sexual assault kit testing initiative. Dickerson's DNA was on a vaginal swab and Jenkins's DNA was on clothing J.R. had been wearing the day of the incident. The case was reopened and assigned to Detective Timothy Clark ("Detective Clark"), who had not originally been involved in the case. J.R. was contacted by Detective Clark. She was shown a photo array, and picked Jenkins as one of the perpetrators, but did not pick Dickerson. In 2014, Dickerson was indicted. Polivka, the driver on the evening in question, was deceased at the time of indictment.[3]

{¶28} On this evidence, the jury found Dickerson guilty of one count each of rape, complicity, and kidnapping. The trial court sentenced him to a five-year prison term under the present sentencing regime. The state presents the following assignment of error for our review:

> [b]ecause Defendant-Appellee committed his offenses prior to July 1, 1996, the trial court erred when it sentenced Defendant-Appellee under sentencing provisions effective July 1, 1996 and H.B. 86 provisions effective September 30, 2011.

{¶29} In his cross-appeal, Dickerson presents the following three assignments of error for our review:

> [I.]    The trial court erred when it failed to dismiss the case for

---

[3]The record does not indicate exactly when Polivka died, but Jenkins's counsel indicated that she believed it was in 2007.

pre-indictment delay.

[II.] Trial counsel provided ineffective assistance of counsel for failing to timely file a motion to dismiss for pre-indictment delay.

[III.] The state failed to meet its burden where there was not sufficient evidence of force or threat of force to sustain a conviction for rape, complicity to rape, and kidnapping pursuant to [R.C.] 2907.02(A)(2), 2905.01(A)(4) and 2923.03(A)(2).

## III. Law and Analysis

### State's Appeal Moot

{¶30} For the reasons set forth below, we find merit to Dickerson's appeal, which renders the state's assignment of error moot. We therefore overrule the state's sole assignment of error.

### Dickerson's Appeal

### Preindictment Delay and Ineffective Assistance of Counsel

{¶31} Dickerson's trial counsel filed a motion to dismiss based on preindictment delay on November 5, 2014, one week before the case went to trial. The trial court denied the motion as untimely. In his first assignment of error, Dickerson contends that the trial court erred in denying his motion. In his second assignment of error, Dickerson contends that his counsel was ineffective for not timely filing the motion.

{¶32} Crim.R. 12 governs pretrial pleadings and motions in criminal cases. The rule provides that pretrial motions "shall be made within thirty-five days after arraignment or seven days before trial, whichever is earlier. The court in the interest of justice may

extend the time for making pretrial motions." Crim.R. 12(D). Dickerson was arraigned on June 6, 2014, and therefore, under Crim.R. 12(D), his motion to dismiss should have been filed in July 2014.

**{¶33}** We consider whether, in the interest of justice, the trial court should have extended the time for the filing of the motion to dismiss. The trial court's decision whether to permit leave to file an untimely pretrial motion is within its sound discretion. *Akron v. Milewski*, 21 Ohio App.3d 140, 142, 487 N.E.2d 582 (9th Dist.1985). Our review is, therefore, limited to whether the trial court abused its discretion in rendering its decision. *Id.* An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). When applying an abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621, 614 N.E.2d 748 (1993).

**{¶34}** The trial court questioned Dickerson's counsel about the untimeliness of his motion. Counsel responded that he had just recently learned that the driver, Jerry Polivka, was deceased. He also stated that he filed his motion based on a then-recent decision from this court, *State v. Mack*, 8th Dist. Cuyahoga No. 100965, 2014-Ohio-4817, *appeal not accepted*, 143 Ohio St.3d 1480, 2015-Ohio-3958, 38 N.E.3d 901.

**{¶35}** The assistant prosecuting attorney responded that the defense was advised of Polivka's death in the state's initial discovery response. The court responded that *Mack* did not change the law on preindictment delay, a finding with which we agree, and

moreover, that *Mack* was not even mentioned in the written motion to dismiss, another true finding. Defense counsel did not dispute the state's claim that the defense was advised of Polivka's death at the early stages of this case.[4]

{¶36} On this record, we do not find that the trial court abused its discretion in denying the motion to dismiss as untimely. The first assignment is therefore overruled, and we next consider whether counsel was ineffective for failing to timely file the motion to dismiss.

{¶37} In order to successfully maintain an ineffective assistance of counsel claim, a defendant must demonstrate that counsel's performance was deficient and that he was prejudiced by counsel's deficient performance; that is, there is a reasonable probability that but for counsel's unprofessional errors the result of the trial or proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Thus, in order to be successful here, Dickerson must demonstrate that his trial counsel performed deficiently by failing to timely raise the claim he now presents, and that there was a reasonable probability of success had counsel timely presented that claim to the trial court. *State v. Mack*, 101 Ohio St.3d 397, 2004-Ohio-1526, 805 N.E.2d 1108, ¶ 31.

{¶38} In *Jones*, Slip Opinion No. 2016-Ohio-5105, the Ohio Supreme Court found

---

[4]The state initially provided the defense with discovery on June 12, 2014. That discovery included a photo identification of Polivka (as picked by the victim from an array), a March 2014 investigative report (which the state claimed reported that Polivka was deceased), and the initial police report. Further, Polivka was not listed as a witness whom the state intended to call at trial.

that in *State v. Jones*, 8th Dist. Cuyahoga No. 101258, 2015-Ohio-2853, 35 N.E.3d 606, this court "blurred the distinctions" between the two-part, burden shifting test used for determining whether preindictment delay is a violation of due process. *Jones*, Slip Opinion No. 2016-Ohio-5105, ¶ 15. The court therefore reversed this court's judgment, and remanded the case to this court

> for a determination of [the defendant's] appeal utilizing the two-part, burden-shifting analysis enunciated in [*State v.*] *Whiting*, 84 Ohio St.3d 215, 1998-Ohio-575, 702 N.E.2d 1199, and the actual-prejudice standard from [*State v.*] *Luck*, 15 Ohio St.3d 150, 472 N.E.[2]d 1097 [(1984)].

*Id.* at ¶ 29.

{¶39} Given the court's mandate in this case, we now consider it under *Luck* and *Whiting* as directed in *Jones*, Slip Opinion No. 2016-Ohio-5105.

### State v. Luck

{¶40} In *Luck*, the victim was murdered in the fall of 1967 and law enforcement began an investigation into her death. The defendant was named as a suspect, and was interviewed by the police in late 1967 and early 1968. Unable to gain traction after their initial investigation into the case, however, law enforcement stopped work on the case. Then, approximately 15 years later, in 1983, the defendant was charged with murdering the victim. The defendant filed a motion to dismiss, contending that the 15-year delay in prosecuting her substantially prejudiced her and, thereby, violated her right to due process.

{¶41} She contended she was prejudiced by three things. First, two key witnesses were deceased. One witness was a doctor who she contended had treated an injury to

her hand on or about the day the victim was murdered. The other witness was an acquaintance of the defendant, who had also been an original suspect. According to the defendant, as stated in a confession she made after her arrest, the acquaintance had been at the victim's apartment at the time she was murdered.

{¶42} Second, the defendant contended that she was prejudiced by fading memories and changes in appearance. She cited that a taxi driver who identified her in 1967, from a 1962 photograph, as having been a passenger in his cab on the date believed to be the murder date, was no longer able to identify her.

{¶43} And third, the defendant contended that she was prejudiced by the loss of evidence, in that all of the tape-recorded interviews of potential witnesses and suspects from 1967 through 1968 had been destroyed, and transcripts of the interviews did not exist.

{¶44} The Ohio Supreme Court considered whether the 15-year delay between the murder and the indictment of the defendant caused substantial prejudice to the defense, thereby violating the defendant's due process rights. The court, citing *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed. 752 (1977), and *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), stated that claims of due process violations based on preindictment delay are subject to a two-part, burden-shifting test: (1) whether the defendant suffered actual prejudice, and (2) whether the prosecution has a justifiable reason for the delay that caused the prejudice. *Luck* at 153-154, 158.

{¶45} In regard to actual prejudice, the *Luck* court found that the grounds set forth

by the defense, that is, the deaths of witnesses, the fading of memories, and the loss of evidence, "when balanced against the other admissible evidence in this case," established that the defendant suffered actual prejudice. *Id.* at 157-158. The court noted that

> [a]lthough the state is in possession of circumstantial evidence which may link the defendant to [the victim's] death, it cannot be said that the missing evidence or the dead witnesses would not have minimized or eliminated the impact of the state's circumstantial evidence.

*Id.* at 157.

{¶46} In regard to the reason for the delay, the prosecution stated that there was an "error in judgment" that led law enforcement to cease its investigation of the case. *Id.* at 158. The court found the delay was "unjustifiable." *Id.* at 159. Citing *Lovasco* and *Marion*, the court noted that although it would

> not assume the role of the prosecutor to determine when there is sufficient evidence to seek an indictment in every case, * * * a delay in the commencement of prosecution can be found to be unjustifiable when the state's reason for the delay is to intentionally gain a tactical advantage over the defendant * * * or when the state, through negligence [or] error in judgment, effectively ceases the active investigation of a case, but later decides to commence prosecution upon the same evidence that was available to it at the time that its active investigation was ceased.

*Luck* at 158.

{¶47} The *Luck* court concluded:

> The delay in the commencement of prosecution against [the defendant] "violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' * * * and which define 'the community's sense of fair play and decency.' * * *" *United States v. Lovasco*, supra, at 790 (citations omitted). We find that this delay is unjustifiable, has resulted in actual prejudice to the defendant, and will effectively deprive the defendant of her right to due process of law under Section 16, Article I of the Ohio Constitution and the Fifth and Fourteenth Amendments to the

United States Constitution should this case proceed to trial.

*Id.* at 159.

### State v. Whiting

**{¶48}** *Whiting* was issued 14 years after the court's decision in *Luck,* and confirmed

> that where a defendant moves to dismiss an indictment and presents evidence establishing substantial prejudice resulting from preindictment delay, the state bears the burden of producing evidence of a justifiable reason for the delay.

*Id.* at 217. Both *Luck* and *Whiting* were discussed in Dickerson's written motion to dismiss.

**{¶49}** Upon review, we find that counsel was deficient for not timely raising the issue of preindictment delay and that there was a reasonable probability of success had it been timely raised.

**{¶50}** Dickerson had a strong, viable claim of actual prejudice based in particular on the unavailability of Polivka. The victim got into the car with the defendants at approximately 1:30 a.m.; the hotel room was not rented by Polivka until approximately 4:42 a.m. The victim was completely unable to remember what had occurred in that time period between getting into the car and arriving at the hotel. This was of concern to at least one juror, who questioned, "[w]hat happened in the time period from 1:30 a.m. to 4:42 a.m.?"

**{¶51}** The state contends that Dickerson would not have been able to demonstrate prejudice relative to the unavailability of Polivka because if he were still alive, "he would

have been indicted and would have been sitting next to [Dickerson] at the defense table for trial. In that situation, [Dickerson] would not have had a right to call Polivka as a witness at trial."

{¶52} During his testimony, Officer Neider stated that, although he had Polivka's name and an address for him, he did not attempt to contact him. A juror wondered about that, questioning "why wasn't the driver considered an accomplice on the commission of this crime or these crimes?" Neider answered, "because at the time his involvement as far as he went to the hotel, rented the room, gave the two black male suspects the keys, and he was no longer involved in the actual incident in the hotel. He left." We recognize that the police do not decide whether to indict, but, nonetheless, the testimony from the state's own witness does not support its contention.

{¶53} That aside, even if Polivka had been alive and indicted, the state's contention that Dickerson would not have been able to question him is purely speculation — it is possible that Dickerson could have had the opportunity to question Polivka. For example, if Polivka had been indicted, he certainly could have pled guilty to any charges and testified against Dickerson and Jenkins as part of a plea deal in hopes of consideration of his testimony at sentencing, in which case, Dickerson would have had the opportunity to cross-examine him. Thus, we are not persuaded by the state's logic.

{¶54} Moreover, although according to the victim's account, Polivka was not present in the hotel where the alleged rapes occurred, he was involved in the alleged kidnapping. There was a dissent in this court's original opinion and it acknowledged that

Polivka's testimony "might have been relevant to the kidnapping counts." *Dickerson*, 8th Dist.Cuyahoga No. 102461, 2016-Ohio-807 at ¶ 57. But the dissent believed that Dickerson did not demonstrate actual prejudice because he "altogether failed to inform the court what Polivka would have testified to at trial, let alone explain how the testimony would have been beneficial to him such that a jury would have likely acquitted him." *Id.* at ¶ 56.

{¶55} Upon careful examination of *Luck* and *Whiting*, it must be noted that the Ohio Supreme Court did not state that in order to demonstrate actual prejudice based on preindictment delay the defendant must state exactly what it was he or she believes an unavailable witness would have testified to.

{¶56} In *Luck*, for example, in regard to the deceased witness on which the claim of actual prejudice was partially based,[5] the defendant contended that the witness was "the one person who could have helped her in this matter but he is dead." *Id.* at 157. The defendant only further offered that the deceased witness was with her at the time of the crime. According to the defendant, the victim attacked her (the defendant) and a fight ensued, during the course of which the victim died. On that record, the Ohio Supreme Court found that the defendant was "obviously prejudiced by not being able to seek verification of her story from [the deceased witness] and thereby establish mitigating factors or a defense to the charge against her." *Id.* at 158.

{¶57} The Ohio Supreme Court recognized in *Jones*, Slip Opinion No.

---

[5]The other grounds, as mentioned, were fading memories and loss of physical evidence.

2016-Ohio-5105, that in *Luck*, "there was no record establishing what [the deceased witness] would have testified to." *Id.* at ¶ 25. The *Jones* court stated that nonetheless, the

> proven unavailability of specific evidence or testimony that would attack the credibility or weight of the state's evidence against a defendant, and thereby aid in establishing a defense, may satisfy the due-process requirement of actual prejudice.

*Id.* Thus, the *Jones* court "reject[ed] the state's suggestion that any claim of actual prejudice based on the death of a potential witness is too speculative to succeed unless the defendant can establish precisely what the witness would testify to and that the testimony would be directly exculpatory." *Id.* at ¶ 27.

{¶58} Evaluating whether Dickerson suffered actual prejudice due to the unavailability of Polivka involves a "'delicate judgment.'" *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 52, quoting *Marion*, 404 U.S. at 325, 92 S.Ct. 455, 30 L.Ed.2d 468; *see also Jones*, Slip Opinion No. 2016-Ohio-5105 at ¶ 20. The judgment should be rendered on "a case-by-case [basis after] consideration of the particular circumstances." *Jones* at *id.*

{¶59} After consideration of this case, we find that Dickerson had a reasonable probability of success in demonstrating actual and substantial prejudice. The circumstances of this case are similar to the circumstances in *Luck*, in that the defendants and the deceased witnesses were together here for, at least part of, the alleged crimes. Polivka was a key witness — he was with the victim for a number of hours during the course of alleged crimes and the victim herself was unable to account for that time.

Thus, under the particular circumstances of this case, we find that Dickerson had a reasonable probability of success in demonstrating actual and substantial prejudice, the first prong of a claim of preindictment delay.

{¶60} Further, under the second part of the preindictment delay test, we find that Dickerson would have had a reasonable probability of success on his motion given the state's reason for the delay. The state contends that the delay was investigative. We find that that argument reasonably could have failed for two reasons.

{¶61} First, the state contends that the Cleveland Police Department did not do DNA testing in 1994, so the "case would have gone to trial with no DNA evidence to corroborate the victim's claim that sexual activity occurred." It is true that a representative from the police department's lab testified that the department did not do DNA testing in 1994. But it is common knowledge that such testing was available at that time and thus, if the case had not been closed, the police department would have sent the evidence to an outside source for testing. Further, the representative testified that the department started doing DNA testing in either 1999 or 2000.

{¶62} Second, the state contends that the delay was investigative because it was unable to secure J.R.'s cooperation. The record here demonstrates that J.R. reached out to the police in the days after the incident by reporting the alleged instance of intimidation by "Mike." Despite that attempt by J.R., the state never did anything to further pursue the case. For all practical purposes, the state closed the case in 1994 after the victim's meeting with the detective immediately following the incident, and did not do any further

investigation and, then, in 2014, with the same evidence it had in 1994, decided to commence its prosecution. As the Ohio Supreme Court has stated, compiling evidence, but simply failing or refusing to take action for a substantial period of time, is not justifiable investigative delay. *Walls*, 96 Ohio St.3d at 454, 2002-Ohio-5059, 775 N.E.2d 829.

{¶63} In light of the above, we find that counsel was deficient for not timely filing the motion to dismiss and that there was a reasonable probability that it would have been granted had it been timely filed. Dickerson's second assignment of error is sustained.

## IV. Conclusion

{¶64} Having found that trial counsel was ineffective by not filing a timely motion to dismiss on the ground of preindictment delay, the conviction against Dickerson is reversed. Dickerson's first assignment of error is overruled, and his third assignment of error is moot. The state's assignment of error is moot and therefore overruled.

It is ordered that appellant/cross-appellee recover of appellee/cross-appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

LARRY A. JONES, SR., PRESIDING JUDGE

PATRICIA ANN BLACKMON, J., CONCURS;
MELODY J. STEWART, J., DISSENTS WITH
SEPARATE OPINION
MELODY J. STEWART, J., DISSENTING:

{¶65} I agree with the majority that the trial court did not abuse its discretion in denying Dickerson's motion to dismiss as untimely. However, I disagree that Dickerson met his burden of proving that trial counsel was ineffective because of the untimely motion. Although there appears to be no justifiable reason for the delay in prosecuting this case (the DNA evidence added nothing to the state's position), Dickerson fails to show that he suffered actual or substantial prejudice by the delay. For this reason, I dissent.

{¶66} Dickerson's biggest hurdle to overcome in support of his prejudice argument is the fact that Polivka was involved, at least in part, with the events that took place in 1994. Contrary to the majority's opinion, the transcript shows that Polivka likely would have been charged as a defendant in this case had the case been further investigated and proceeded to trial while he was still alive. The majority fails to mention the fact that Polivka was named as a suspect in the initial police report filed on the day after the incident in 1994.

{¶67} Moreover, the majority misconstrues Officer Neider's testimony. At the time of trial, Officer Neider was a retired Cleveland police officer who had been the first responder when J.R.'s mother called the police to report what happened the day after the

incident. Officer Neider's testimony recalled what he could remember from his initial investigation before he handed the case over to the sex crimes unit for further investigation days later. Officer Neider's testimony focused almost exclusively on how he came to investigate the rape allegations and coordinate the motel room arrests of Dickerson and Jenkins. Officer Neider did not testify about Polivka's involvement in the crimes except to say that he came to know of his involvement after J.R. told him that a white man took them to the motel and got the room key, and the motel room receipt indicated that Polivka had rented the room. Based on this information, Neider listed him as a suspect in the police report, gave a description of the man based on the victim's observations, and noted an address for Polivka that he obtained through the police department's address database.

{¶68} Although Officer Neider testified that he did not arrest Polivka at that time, Dickerson and Jenkins had been arrested and were being held. According to Officer Neider, he quickly transfered the case to the sex crimes unit for further investigation because Dickerson and Jenkins would be released after 72 hours if they were not charged within that time. When Officer Neider was asked at trial why Polivka was not considered an accomplice in the commission of the crimes, Officer Neider answered:

> Because at the time his involvement as far as he went to the hotel, rented the room, gave the two black male suspects the keys, and he was no longer involved in the actual incident in the hotel. He left.

It is clear from Officer Neider's testimony that his investigation mostly focused on the rape allegations and ensuring that those who may have committed the rapes were charged.

It is also clear that the initial investigation, for which he was involved, lasted no longer than a couple of days before it was transferred to a different unit. Because Officer Neider's testimony was based on facts he had been given in the initial hours after the incident and before it was transferred to the sex crime unit, it is unreasonable to look to his testimony as evidence that Polivka would not have been charged at a later date. In fact, the testimony of Detective Clark — the investigator in the cold case unit who received the file from BCI after Dickerson's DNA matched swabs from the rape kit — seems to suggest that Polivka most certainly would have been charged.

{¶69} Detective Clark testified that the initial police report listed three suspects involved in the case: Dickerson, Jenkins, and Polivka. After getting the case, Detective Clark contacted the victim, made an appointment to meet with her, and later attempted to contact the suspects, including Polivka by leaving his business card and information at their last know addresses. In attempting to contact Polivka, he learned that the suspect had died. Detective Clark never heard from Dickerson or Jenkins. Nevertheless, proceeding on only J.R.'s account of the events and the initial police report, Detective Clark contacted the assistant prosecuting attorney and brought the case before the grand jury. Thus, Detective Clark's testimony shows that Polivka was always a suspect in the crimes who was subject to being charged upon further investigation. It is undisputed that the victim was able to identify Polivka as the person driving the car that night and as one of the persons who coerced her to get into the vehicle before taking her to, and paying for, a motel room that was used that night. Given these facts, it would be beyond belief that

Polivka would not have been charged for his role he played in these events had he been alive at the time Dickerson was indicted.

**{¶70}** Further, I disagree with the majority's suggestion that had Polivka been alive and charged, he may still have been available to testify in a way that would ultimately bolster Dickerson's position. The majority opinion states that "the [prosecution's] contention that Dickerson would not have been able to question [Polivka] is purely speculation." By way of explanation, the majority sets forth a scenario where it was possible that the state could have offered Polivka a plea deal in exchange for his testimony against Dickerson and Jenkins. According to the majority, under such conditions, Dickerson would have been able to cross-examine Polivka. However, prosecutors are not keen on offering plea deals to witnesses in exchange for testimony that would tend to favor defendants. Thus, if Polivka were in a position to testify against Dickerson and Jenkins, that testimony would have likely aided the state's case.

**{¶71}** I agree with the majority that, in light of *State v. Jones*, Slip Opinion No. 2016-Ohio-5105, a defendant need not set forth exactly what an unavailable witness might have said if he or she were available to testify. However, it is still necessary that the defendant explain how the unavailable witness's testimony would hurt or undermine the state's case and aid the defense. *See id.* at ¶ 28 ("Actual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense," citing *State v. Luck*, 15 Ohio St.3d 150, 157-158, 472 N.E.2d 1097 (1984).).

Again, assuming the ability to have Polivka testify even though he would likely have been a codefendant, Dickerson fails to show how any testimony from Polivka would have minimized or eliminated the impact of the state's case against him.

{¶72} As the majority references, in the earlier dissent on this case I noted that Polivka's testimony might have been relevant to the kidnapping count — and that would only be in relation to getting in the car, not being held in the motel room. However, I still fail to see how such missing testimony prejudiced Dickerson. Unlike the missing witnesses in *Luck*, Polivka was not a neutral third-party witness in this case.[6] He was a participant in the first part of the events that took place that night, which included the initial kidnapping. And because at no point was he present in the hotel room, it is impossible to see how any testimony he might have given would be relevant to the charges stemming from what took place in the hotel room.

{¶73} Though Dickerson points out that Polivka was in the car with the defendants and the victim between the hours of 1:00 a.m and 4:42 a.m. on the morning of the alleged kidnapping and rapes — a time frame that the victim could not recall at trial— Dickerson has failed to make a coherent argument for why Polivka's testimony regarding this time frame would aid in his defense. In his brief, Dickerson maintains that Polivka could

---

[6] Although the key unavailable witnesses in *Luck* was an early suspect in the case, that person was no longer a suspect at the time of Luck's indictment and prosecution. In a confession to police that would eventually be suppressed by the trial court, Luck stated that the victim's death was the result of her use of force in self-defense and that because the witness was with her at the time of the act, he could have testified in her defense had he still been alive. Thus in *Luck*, unlike here, the unavailable witness was not implicated as an actor in the crime and was truly a potential defense witness.

have shed light on what occurred during this time and that "[c]ertainly, he would have amplified her [J.R.'s] account that she was intoxicated and would have supported Mr. Dickerson's claim that the conduct was consensual." This argument is flawed for several reasons. First, it completely ignores the fact that one cannot consent to sex if the person is substantially impaired due to intoxication, *see, e.g., In re King*, 8th Dist. Cuyahoga Nos. 79830 and 79755, 2002-Ohio-2313, ¶ 20-23. Second, the argument ignores the fact that consent, even if initially given, can be revoked. Thus, Polivka could not have testified in any credible manner as to whether the victim consented to the sex while at the hotel. Finally, Dickerson's argument ignores the fact that Polivka would have been in substantially the same position to Dickerson as Jenkins was to Dickerson. Jenkins was alive at the time of trial, yet there is nothing that shows how this fact aided or assisted Dickerson or weakened the state's case. Dickerson fails to show how the same scenario would not apply with equal force to Polivka.

{¶74} Lastly, Dickerson does not explain how the victim's faded memories prejudiced him. At trial, the victim stated that she could not remember a three-hour interval between the time when she got into the car and when she arrived at the hotel. If anything, the victim's faded memories were more harmful to the state's case because the faded memories could have damaged her credibility.

{¶75} For the above reasons, I dissent from the decision to reverse the conviction.